# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| SANDRA DORRELL and PHILLIP A. WILKINSON, individually and on behalf of a class of all others similarly situated, | § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CIVIL ACTION NO. 3:16-cv-1152 |
| PROSKAUER ROSE, LLP, and THOMAS V. SJOBLOM, | § § § | |
| Defendants. | § | |

## **PLAINTIFFS' ORIGINAL COMPLAINT**

## TABLE OF CONTENTS

I.     **PREFACE** ........................................................................................................ 1

II.    **PARTIES** ....................................................................................................... 3

III.   **PERSONAL JURISDICTION** ................................................................. 4

IV.   **SUBJECT MATTER JURISDICTION AND VENUE** ............................ 5

V.    **FACTUAL BACKGROUND** ...................................................................... 5

    **A.** The Stanford Financial Group Empire .......................................................... 5

    **B.** Stanford Financial's Operations in the United States .................................... 7

    **C.** The Anatomy of the Stanford Ponzi Scheme ................................................ 9

       1.  The Beginning: Guardian International Bank ...................................... 11

       2.  Stanford Creates a Safe Haven in Antigua ........................................ 13

    **D.** Stanford Financial Breeds Loyalty Through Exorbitant Compensation................... 19

    **E.** Dissecting the Fraud ................................................................................... 20

    **F.** Stanford Financial's House of Cards Finally Collapses ............................ 23

    **G.** Stanford Financial's Regulatory Obstruction and Concealment Conspiracy ........... 24

    **H.** Defendants' Role in Shielding and Perpetuating the Fraud ...................... 32

       1.  Sjoblom Gains Early Knowledge of Stanford's Fraud ...................... 32

       2.  Sjoblom's Misrepresents Material Facts and the Law to the SEC ...................... 42

       3.  Sjoblom Witnesses Allen Stanford's Order to "Paper the Files" ...................... 43

       4.  Sjoblom Tries to Conceal the SEC Investigation from SGC's Auditor ............. 45

       5.  Proskauer and Sjoblom Assist the Stanford Fraud ............................ 46

       6.  The SEC Moves Forward with a Formal Order of Investigation...................... 50

       7.  Sjoblom Advises Stanford Financial to Violate SEC Subpoenas ...................... 52

       8.  Proskauer Tries to Conceal SEC Investigation from BDO Seidman ................. 55

       9.  The SEC Issues Document and Testimony Subpoenas to Allen Stanford .......... 56

      10. Suspicious Facts and Allegations of Fraud Continue to Mount ...................... 57

      11. Proskauer Lies to BDO Seidman Again ........................................... 58

      12. Former SGC Financial Advisors Allege that SGC Destroyed Documents ......... 59

      13. FINRA and the Federal Reserve Board Pursue Their Own Investigations.......... 59

      14. Sjoblom Learns the Full Extent of SIBL's Real Estate and Private Equity ......... 64

      15. The SEC Requests Testimony Regarding SIBL's Investments ...................... 65

16. Sjoblom Discovers More Incriminating Facts About SFIS and SIBL ................. 65

17. FINRA Raids SGC's Offices Across the United States ....................................... 66

18. Opinion Letter Confirms that SIBL is an "Investment Company" ..................... 67

19. Sjoblom Explicitly Agrees to Offer False Testimony to the SEC ...................... 68

20. Sjoblom Prepares Rodriguez-Tolentino and Pendergest-Holt for Testimony...... 70

21. Allen Stanford Meets with Sjoblom and Personally Admits the Fraud .............. 73

22. Sjoblom Prepares Pendergest-Holt for False Testimony to the SEC .................. 76

23. Sjoblom Knowingly Presents False Testimony to the SEC ................................ 77

24. Sjoblom Withdraws and Disavows All Prior Representations ........................... 78

VI.    EXCEPTIONS TO ATTORNEY IMMUNITY ......................................................... 79

VII.   STATUTE OF LIMITATIONS DEFENSES............................................................ 79

       **A**. Discovery Rule/Inquiry Notice/Class Action and Equitable Tolling ...................... 79

VIII.  BASIS FOR PLAINTIFFS' CLAIMS ...................................................................... 80

       **A**. Plaintiffs' Investments................................................................................ 81

       **B**. Class Allegations...................................................................................... 83

IX.    CAUSES OF ACTION ............................................................................................ 84

       **A.** Aiding and Abetting Violations of the Texas Securities Act.................................... 85

       1.   Sales of Unregistered Securities ...................................................... 85

       2.   Sales of Securities by Unregistered Dealers ........................................ 88

       3.   Untruth or Omission .................................................................... 89

       **B**. Participation in/Aiding and Abetting Breach of Fiduciary Duty .............................. 91

       **C.** Aiding and abetting/Participating in a Fraudulent Scheme ...................................... 92

       **D.** Civil Conspiracy....................................................................................... 93

X.     RESPONDEAT SUPERIOR..................................................................................... 95

XI.    ACTUAL DAMAGES ............................................................................................. 95

XII.   PUNATIVE DAMAGES ......................................................................................... 95

XIII.  JURY DEMAND ..................................................................................................... 95

XIV.   PRAYER ................................................................................................................. 96

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SANDRA DORRELL and PHILLIP WILKINSON, individually and on behalf of a class of all others similarly situated, | § § § § | |
| Plaintiffs, | § § | |
| | § | CIVIL ACTION NO. |
| vs. | § § | |
| PROSKAUER ROSE, LLP, and THOMAS V. SJOBLOM, | § § § | |
| | § § | |
| Defendants. | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

NOW COME Plaintiffs Sandra Dorrell and Phillip A. Wilkinson, individually (the "Named Plaintiffs") and on behalf of all others similarly situated (the "Class Plaintiffs") (collectively, "Plaintiffs"), by and through their undersigned attorneys, and file this Original Complaint ("Complaint") against Defendants Proskauer Rose, LLP, and Thomas V. Sjoblom (collectively, the "Defendants"), and allege as follows:

## I.    PREFACE

1.      On August 27, 2009 three Stanford investor victims filed the putative class action lawsuit styled *Troice v. Proskauer Rose et a*l. in this Court as Case No. 3:09-cv-01600 (the "*Troice* Action").  After years of protracted litigation that reached the United States Supreme Court, and following the filing of motions, briefs and evidence in support of class certification – but prior to any decision on class certification by this Court - on March 10, 2016 the Fifth Circuit ordered the dismissal of the Troice Action based on the doctrine of attorney immunity.  *Troice v.*

*Proskauer Rose LLP*, ___ F. 3d ___, 2016 WL 929476 (5th Cir. 2016).  However, in doing so the Fifth Circuit noted that it had not considered three exceptions to attorney immunity raised by the *Troice* plaintiffs on appeal because the *Troice* plaintiffs had not raised them in the District Court. *Id.*, at *6 and footnote 3.

2.      While the decision by the Fifth Circuit dismissed the three named *Troice* plaintiffs' individual claims, it had no *res judicata* effect on claims of unnamed class members since the putative class had not been certified.  See, e.g., *Casas v. American Airlines, Inc.*, 304 F. 3d. 517, 526 n. 12 (5th Cir. 2002); *Muhammad v. Giant Food Inc.*, 108 F. App'x 757, 765 n.5 (4th Cir. 2004) ("While the rejection of the named employees' individual claims is binding as to those employees, it does not preclude later efforts to certify a class action against Giant or bar any individual claims that might be asserted in such an action."); *Wright v. Schock*, 742 F.2d 541, 544 (9th Cir. 1984) ("[A]s the matter now stands, defendants have prevailed only against the name plaintiffs.  The judgment will not be *res judicata* as to other individual plaintiffs or other members of any class that may be certified."); *Coalition to Defend Affirmative Action v. Regents of the Univ. of Mich.*, 539 F. Supp. 2d 960, 974 (E.D. Mich. 2008).  ("Dismissal prior to certification is *res judicata* as to the class representatives, but has no effect on the putative class members.").  It merely disqualified the three named *Troice* plaintiffs from continuing to serve as class representatives.  See *Stanley v. Walmart*, 839 F. Supp. 430, 435 (N.D. Tex. 1993); *Cowen v. Bank United of Texas*, 70 F. 3d. 937, 941 (7th Cir. 1995) ("[a] decision that the claim of the named plaintiffs lacks merit ordinarily...disqualifies the named plaintiffs as proper class representatives.").

3.      This action is filed as a putative class action because this Court never decided the issue of class certification in the *Troice* Action, and therefore the class mechanism remains the

superior mechanism for litigating Plaintiffs' claims.  Furthermore, because the *Troice* Action was dismissed prior to a ruling on class certification in the *Troice* Action, limitations on the class claims were tolled during the pendency of the *Troice* Action.  *Smith v. Texaco*, 88 F. Supp. 2d. 663, 671 (E.D. Tex. 2000); *McKowan Lowe & Co. v. Jasmine Ltd.*, 295 F. 3d. 380, 398 (3rd Cir. 2002).  "[W]e see no good reason why class claims should not be tolled where the district court had not yet reached the issue of the validity of the class."); *Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 731 F. Supp. 2d 850, 854 (E.D. Wis. 2010) (allowing new class action to benefit from *American Pipe* tolling rule when class certification decision never reached in prior suit); *Yang v. Odom*, 392 F.3d 97, 111-12 (3d Cir. 2004) (allowing tolling for second class action where denial of certification in first class suit was "unrelated to the appropriateness of the substantive claims for certification").

## II.    PARTIES

4.    Plaintiff Sandra Dorrell is a citizen of the United States of America currently residing in Harris County, Texas.

5.    Plaintiff Phillip A. Wilkinson, is a citizen of the United States of America currently residing in Harris County, Texas.

6.    Additionally, this case seeks certification of a class of all persons or entities that deposited money in SIBL CDs or other investment accounts with Stanford International Bank Ltd. ("SIBL") within the limitations period, and still held said SIBL CDs or SIBL accounts as of February 17, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action,[1] and/or such other classes or sub-classes as the Court may determine.

---

[1] *SEC v. Stanford Int'l Bank Ltd., et al.*, Civil Action No. 3-09-CV-0298N, in the U.S. District Court for the Northern District of Texas, Dallas Division.

3

7.     Defendant Proskauer Rose, LLP ("Proskauer") is a limited liability partnership organized under the laws of the State of New York. Under Federal Rules of Civil Procedure 4(e)(1) and 4(h)(1)(A), and Texas Rules of Civil Procedure 106(a)(2) and 108, Proskauer may be served with process by mailing a true copy of the citation with an attached copy of this Complaint, by registered or certified mail, return-receipt requested, to its agent authorized to receive service of process,  Corporation Service Company, 80 State Street, Albany, New York, 12207-2543.

8.     Defendant Thomas V. Sjoblom ("Sjoblom") is an individual who currently resides in the State of Virginia.  From 2006 to 2009, Defendant Sjoblom was a partner at Defendant Proskauer.   Sjoblom  may  be  served  with  service  of  process  at  the  following  address: International Square, 1875 I Street N.W., Suite 500, Washington, D.C. 20006.

### III.     PERSONAL JURISDICTION

9.     This Court has personal jurisdiction over non-residents Proskauer and Sjoblom under the Texas Long Arm Statute. Said Defendants conducted continuous and systematic business in the State of Texas for over two years and are therefore subject to general jurisdiction. Furthermore, as described herein, the Defendants engaged in specific jurisdiction contacts with the State of Texas, specifically with Stanford Financial, including Stanford Group Company and Stanford International Bank Ltd., headquartered in Houston, Texas. These specific jurisdiction contacts by the Defendants give rise to Plaintiffs' causes of action, and therefore the Defendants have done business and committed torts, in part, in the State of Texas.

10.     From approximately August 2006 until February 2009, Proskauer and Sjoblom provided legal services to Stanford Financial, headquartered and controlled in Houston, Texas, including but not limited to Stanford Group Company and Stanford International Bank Ltd.

Specifically, Proskauer and Sjoblom aided Stanford Financial to ward off investigations conducted by the United States Securities and Exchange Commission ("SEC"), the National Association of Securities Dealers ("NASD"), and the Federal Reserve Board.

11.     When providing such services to Stanford Financial, the Defendants engaged in extensive contacts with Stanford Financial personnel based in Houston, Texas, including Allen Stanford and the General Counsel of Stanford Financial, and attended various meetings with such personnel in Houston, Texas. These contacts assisted and perpetuated the Stanford Ponzi scheme described herein and give rise to Plaintiffs' causes of action. Based on their general and specific contacts with the State of Texas, the Defendants purposefully availed themselves of the privilege of conducting activities within Texas and have established minimum contacts with the State of Texas under the Texas Long Arm Statute.

## IV.     SUBJECT MATTER JURISDICTION AND VENUE

12.     This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. §1332(d)(2)(A) because this action is, in part, a class action in which the amount in controversy exceeds $5,000,000.00 and is a class in which some members of the Plaintiff class are citizens and residents of states different from Defendants.

## V.     FACTUAL BACKGROUND

### A.     The Stanford Financial Group Empire

13.     From the mid-1980s through February 2009, R. Allen Stanford ("Stanford") — a former bankrupt gym owner from Mexia, Texas — built a financial service empire that at its height boasted 30,000 customers in 130 countries managing billions of dollars in investment funds. The empire was comprised of over 140 companies from across the globe, all of which were ultimately owned by Stanford himself. The companies operated under the brand name

"Stanford Financial" with their worldwide headquarters located in Houston, Texas. The conglomeration of Stanford companies (collectively, "Stanford Financial" or "Stanford Financial Group") included but were not limited to: (i) the Houston, Texas-based registered broker/dealer and investment adviser company Stanford Group Company ("SGC"); (ii) the Houston-based administrative company that serviced all the different companies, Stanford Financial Group Company; (iii) Stanford International Bank Ltd. ("SIBL"), an offshore bank organized under the laws of Antigua; (iv) Stanford Trust Company (Louisiana) ("STC"); (v) Stanford Trust Company Ltd. (Antigua) ("STCL"); and (vi) the representative offices of Stanford Trust Company Ltd. (Antigua), d/b/a "Stanford Fiduciary Investor Services" ("SFIS"), that operated in Miami, Houston, and San Antonio. Stanford Financial was ultimately controlled and managed from Houston, Texas in the United States.

14.     Stanford Financial's offshore banking operation began as Guardian International Bank in the mid-1980s. Over the years, Stanford Financial grew into a purported full-service financial services firm, offering worldwide clients private banking and U.S.-based broker/dealer and investment adviser services. Stanford Financial gave its clients all the appearances of a highly successful operation, with lavish offices in some of the world's premier cities. Stanford himself made the Forbes list of the richest people in the world with a personal fortune estimated at $2.2 billion.

15.     The entire Stanford Financial operation was fueled primarily by one product: Certificates of Deposit ("CDs") issued by SIBL, which was wholly owned by Stanford himself. Clients who were introduced to Stanford Financial, whether in Houston, Miami, Caracas, or Mexico City, quickly learned that the main financial product peddled by the group was the SIBL CD. SIBL CDs were sold worldwide by a web of different Stanford Financial promoter

6

companies, including SGC, STC and SFIS, whose function was to promote the sale of SIBL CDs.  In addition, Stanford Financial established representative offices in Colombia (Stanford Group Columbia a/k/a Stanford Bolsa y Banca), Ecuador (Stanford Group Ecuador a/k/a Stanford Group Casa de Valores, S.A. and Stanford Trust Company Administradora de Fondos y Fideicomisos, S.A.), Mexico (Stanford Group Mexico a/k/a Stanford Group Mexico S.A. de C.V. and Stanford Fondos), Panama (Stanford Group Panama a/k/a Stanford Bank Panama and Stanford Casa de Valores Panama), Peru (Stanford Group Peru a/k/a Stanford Group Peru S.A. Sociedad Agente de Bolsa), and Venezuela (Stanford Group Venezuela a/k/a Stanford Group Venezuela C.A., Stanford Bank Venezuela, and Stanford Group Venezuela Asesores de Inversion). These foreign offices were ultimately controlled and administered by Stanford Financial employees in Houston, Texas and almost exclusively peddled SIBC CDs. By February 2009, Stanford Financial's records reveal that SIBL had total purported CD account balances of approximately $7.2 billion.

### B.      Stanford Financial's Operations in the United States

16.      For the first decade of its operations, 1985 to 1995, Stanford Financial and its offshore bank (whether Guardian or, later, SIBL) targeted a Latin American clientele. But by the late 1990s, Stanford Financial Group had established a foothold in the United States. In 1995, Stanford Financial Group established SGC, and in February 1996, SGC was registered as a broker/dealer and investment adviser. SGC established offices initially in Houston and Baton Rouge, Louisiana.  SGC began the practice of "head hunting" for U.S. brokers, bankers, and other financial advisers, paying them enormous signing bonuses to leave their jobs at other firms and transfer their books of clients over to SGC. Fueled by this influx of veteran bankers, brokers and financial advisers, SGC grew from 6 branch offices in the United States in 2004 to more than

25 offices across the United States (but principally concentrated in the Southern United States) in 2007.

17.     Since the 1980s, Allen Stanford recognized the huge potential for marketing his offshore CDs to Latin Americans via the "gateway" city of Miami. In 1998, Stanford Financial established SFIS as representative office of STCL in order to sell the SIBL CDs to foreign investors out of Miami, and thereby evade federal banking and securities regulations.   The Miami office of SFIS generated over $1 billion in SIBL CD sales for Stanford Financial, primarily from sales to CD investors from South American countries such as Colombia, Ecuador, Peru, and Venezuela. Stanford Financial also set up SFIS offices in Houston and San Antonio, Texas to cater to Mexican investors visiting those cities.

18.     Stanford Financial also increased sales of SIBL CDs by targeting the IRA accounts of its U.S. investors. In 1998, Stanford Financial Group established STC in Baton Rouge, Louisiana to serve as the trustee/custodian for IRA accounts owned by investors referred from SGC. After STC was established, SGC's brokers and investment advisers convinced the IRA investors to invest some or, in many cases, all of their IRA accounts into the SIBL CDs.

19.     For all of these promoter companies – whether SGC, SFIS, or STC – the primary product marketed and sold was the SIBL CD, as it sustained Stanford Financial's operations and paid the employees' exorbitant salaries and bonuses. The promoter companies were all members of Stanford Financial, were ultimately owned by Stanford himself, were interconnected via intercompany marketing and referral fee agreements, and were controlled by Stanford Financial in Houston, Texas.

20.     Houston, Texas was Stanford Financial's nerve center and principal base of all operations, including for SIBL, SGC, SFIS, and STC.   All the sales and marketing practices for

the entire Stanford Financial group of companies — including SIBL — as well as general operational and administrative functions, were managed under the overall direction, supervision, and control of the Houston offices of Stanford Financial. SIBL itself never had a marketing or sales arm in Antigua; rather it depended entirely on all the separate promoter or "feeder" companies like SGC, SFIS, and STC to sell its CDs. The head of Stanford Financial's global sales operation for the marketing and sale of SIBL CDs was located in Houston, Texas.

21.     The sales practices, directives, techniques, strategies and reward programs for Stanford Financial, including SIBL, were developed and crafted in Houston and disseminated to the various Stanford Financial branch offices around the world, including STC and SFIS. The sales force training manuals, promotional literature, and materials for SIBL, including the Spanish-language promotional materials used by SGC, STC and SFIS, were created, printed, packaged and mailed from Stanford's Houston headquarters to the other Stanford Financial sales offices around the world to be utilized by the local sales force in each country.

22.     In addition, mandatory sales training for the Stanford Financial sales force for SIBL CDs was conducted principally in Houston (known to the foreign financial advisers as the "Houston experience") by Stanford Financial personnel. In those mandatory training sessions, sometimes twice a year, Stanford Financial's financial advisers ("FAs") were trained to sell the image of Stanford Financial. The "script" for why SIBL was a safe and secure place to invest money, as set forth in the training manuals and reinforced "live" in Houston, was drilled into their heads.

## C.     The Anatomy of the Stanford Ponzi Scheme

23.     In reality, Stanford Financial was a massive, worldwide Ponzi scheme. The gist of the fraud was actually quite simple. Stanford Financial sold SIBL CDs through a flashy

marketing campaign that was designed to trick investors into believing they were purchasing safe, secure, insured, and highly liquid CDs, which were purportedly regulated in the United States because SGC was a U.S. licensed broker/dealer and Stanford's headquarters was based in Houston. At the same time, SIBL was purportedly based in Antigua but controlled and directed from the United States. Stanford maintained a veil of secrecy over SIBL's purported investment portfolio and its use of CD investors' money. See generally Opinion of the Commission in *In re Bernard Young*, SEC Admin. Proc. File No. 3-15003 (Mar. 24, 2016), attached as Exhibit "1" hereto (the "SEC Opinion").[2] In fact one of the fundamental pillars of the Stanford fraud was Stanford's failure to disclose to investors that SIBL did not allow investors or even Stanford Financial personnel like the FAs to gain access to SIBL's portfolio information to verify the actual assets in the portfolio. Thus, Stanford Financial went to great lengths to keep prying eyes, particularly regulatory eyes, away from SIBL's purported operations and assets.

24. SIBL was actually insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) from at least 1999 and yet it continued selling CDs to the bitter end. Stanford Financial induced investors to buy CDs by offering unusually consistent and above-market rates, publishing fraudulent financial statements prepared by a small accounting firm in Antigua, C.A.S Hewlett & Co., Ltd. ("Hewlett & Co."), furnishing other data that significantly overstated SIBL's purported earnings and assets, and misrepresenting the bank's financial strength, safety and nature of its investments, while omitting material facts from investors.

25. In reality, SIBL's earnings and assets were insufficient to meet its CD-payment obligations, so the only way Stanford Financial could keep the scheme going was by using proceeds from new CD sales to pay redemptions, interest, and operating expenses. SIBL's purported assets were fraudulently inflated to offset CD obligations and its revenues were

---

[2]   Plaintiffs hereby incorporate the text of the SEC Opinion in full as part of this Complaint.

"reverse-engineered" to arrive at desired levels. Each year or quarterly reporting period, Stanford Financial would simply determine what level of fictitious revenue SIBL "needed" to report to entice investors, satisfy regulators, and purport to cover its CD obligations and other expenses. Stanford Financial would then "plug" the necessary revenue amount by assigning equally fictitious revenues to each category (equity, fixed income, precious metals, alternatives) of a fictitious investment allocation.

26.     The only way Stanford could get away with his fraud was by ensuring that investors, regulators and others never gained access to the true contents of the SIBL portfolio. See SEC Opinion, attached as Exhibit "1" and incorporated herein.  Thus Stanford Financial's very existence came to depend on Stanford's ability to maintain a "Wizard of Oz"-style veil of secrecy over the SIBL portfolio.  *Id*.  No one – not even Stanford's own sales force responsible for marketing the SIBL CDs to investors – was allowed to peak behind the veil, and SIBL's portfolio remained cloaked in secrecy until the very end.  *Id*.  Of course Stanford neglected to disclose to the investors that SIBL refused to provide access to its portfolio information.

## 1.     The Beginning: Guardian International Bank

27.     Stanford opened his first offshore bank, Guardian International Bank Ltd. ("Guardian Bank"), in 1985 on the tiny Caribbean island of Montserrat (12,000 residents). To provide the veneer of legitimacy and aid sales, Stanford established representative offices for Guardian Bank in Miami and Houston, under the name of Guardian International Investment Services.  Guardian provided the starting point and roadmap for creating the Stanford Financial empire, as Stanford followed this same strategy for the next 24 years of combining an offshore bank with strict secrecy laws and lack of portfolio transparency with U.S. sales and administrative offices.  Guardian Bank's main product was a bank certificate of deposit — with

rates typically 2% to 3% above the average rates available in the U.S. market — and protected by all the confidentiality associated with offshore private banking. Stanford brought in his old college roommate James Davis to help run operations.

28.     By 1988 Stanford had been accused of violating banking laws in Texas for running unlicensed "feeder" sales offices in Houston for Guardian Bank. In 1988 and again in 1989, the U.S. Office of the Comptroller of the Currency ("OCC") issued advisories concerning Stanford's similar violations of banking laws in Florida and California.

29.     By 1989, the banking system in Montserrat itself came under investigation by British and U.S. authorities. Consequently, Guardian Bank itself came under scrutiny for possible drug money laundering.  On November 28, 1990, the Financial Secretary of Montserrat notified Stanford that it was going to revoke Stanford's banking licenses because: (i) Guardian Bank's auditor, Hewlett & Co., was not an approved auditor; (ii) Guardian Bank was operating in a manner "detrimental to its depositors"; (iii) Guardian Bank failed to supply satisfactory details as to its liquidity; (iv) one of Guardian Bank's directors (Stanford) was formerly bankrupt; and (v) Guardian Bank had failed to submit annual financial statements.

30.     Before the threatened revocation could be imposed, however, Stanford picked up and re-incorporated Guardian Bank in Antigua in December 1990, and transferred all the assets of his Montserrat-licensed Guardian Bank to the new Antiguan-licensed Guardian Bank.  By May 1991, Stanford's banking license was officially revoked by the Montserrat Government (although in 1994 Stanford later sued the Government of Montserrat to have that order rescinded). After re-incorporating Guardian Bank in Antigua, Stanford continued the same basic business plan that had proven so profitable when the bank was incorporated in Montserrat. Stanford eventually changed the name of his offshore bank from Guardian to Stanford

International Bank Ltd. (SIBL) in 1994.

## 2.     Stanford Creates a Safe Haven in Antigua

31.     Stanford could not have perpetuated this fraud without his significant control and influence over the Antiguan Government, because the Antiguan Government was the only regulator that was (purportedly) allowed access to SIBL's investment portfolio.  To gain this influence, Stanford used bribes to curry favor with Antiguan officials and build a safe haven for his Ponzi scheme. When Stanford fled to Antigua in December 1990, Antigua had the reputation of being the most corrupt island in the Caribbean.

32.     Stanford immediately "bought" his influence in Antigua by purchasing the ailing and insolvent Bank of Antigua. He extracted concessions from the Antiguan Government, including permits to establish a new bank by replacing Guardian Bank with SIBL and Stanford Trust Company Ltd. ("STCL"), as well as residency status in Antigua for Stanford and his top executives.

33.     In 1994, Stanford strengthened his Antiguan political ties by inserting himself and his companies into the Antiguan Government's efforts to build a new hospital. This opportunity arose when Stanford helped the Prime Minister, Lester Bird, by flying him to Houston and paying for all of Bird's medical expenses after Bird thought he was having a heart attack.

34.     In November of that year, Bird allowed Stanford to select contractors for the hospital project, and Stanford's bank assumed the role of lead financier on the project. Stanford's Bank of Antigua  purportedly funded an interim loan to the Antiguan Government to finance 100% of the project's architectural and engineering costs. Eventually, Stanford Financial loaned the Antiguan Government over $40 million for the new hospital. The impoverished Antiguan Government, which served as SIBL's *only* purported regulator, became heavily indebted to

Stanford.

35.     By 1996, the government in Antigua even allowed Stanford to rewrite the banking laws that regulated SIBL. In September 1996, Stanford's agents directed a letter to Antigua's Prime Minister, Lester Bird, and offered suggestions on how Antigua could clean up its banking sector. The letter noted how Antigua had recently been the subject of some terrible reports in the press, including an article in the Washington Post, which described how Antigua and its offshore banking sector had become a haven for fraudsters and con artists. The letter then suggested 15 steps for the government to take to establish some credibility for Antigua's financial sector.

36.     In June 1997, at Stanford's instigation, the Antiguan Government formed and chartered the "Antiguan Offshore Financial Sector Planning Committee." The Committee's purpose was to offer recommendations for reforming Antigua's offshore banking sector. Not surprisingly, Stanford was appointed to chair the Committee. The Committee formed a Task Force (the "Stanford Task Force") to (i) review all offshore banks licensed in Antigua to ensure they were legitimate, and (ii) evaluate Antigua's banking regulatory regime and make recommendations to address any weaknesses. Stanford appointed every member of the Task Force, and every member was on Stanford Financial's payroll. No Antiguan citizen served on the Stanford Task Force.

37.     On September 15, 1997, the Task Force outlined some of its recommendations to the Antiguan Government. In the section entitled "International Cooperation," the Task Force wrote that, while it was important for the Antiguan Government to cooperate with the judicial and regulatory authorities of other countries, at the same time, "*it is essential that Antigua and Barbuda not permit the wealth of its people and businesses to become the targets of overly aggressive enforcement actions*." One way to avoid such "overly aggressive enforcement

14

actions," according to the Task Force, was to revise the list of "prescribed offenses" in Antiguan law such that the Antiguan Government would only be required to cooperate with foreign governments with respect to the "*most serious of crimes, as intended, and not to lesser crimes which could conceivably be included under such vague terms as 'fraud' or 'false accounting'*."

38.     The Task Force's reforms in Antigua created a new Antiguan regulatory body, the International Financial Sector Authority ("IFSA"), which was charged with supervising and regulating the offshore banking sector. Incredibly, Stanford was appointed to serve as the Chair of the IFSA. Furthermore, one of Stanford Financial's U.S. lawyers served along with its Antiguan lawyer, Errol Cort, who also happened to be the Attorney General of Antigua. As a former member of the British High Commission in Barbados, Rodney Gallagher, put it: "*Stanford effectively became the man who controlled the regulator.*"

39.     In response, in April 1999, the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN") issued an Advisory (the "Advisory") to warn banks and other financial institutions that banking transactions involving Antigua should be given enhanced scrutiny because the Antiguan government had *significantly weakened* its banking laws and regulatory agencies. The nearly unprecedented Advisory also warned that the Antiguan Government had vested supervisory authority to a new regulator, the IFSA, which was rife with conflicts of interest because its "*board of directors includes representatives of the very institutions the Authority is supposed to regulate.*" According to the Advisory, this "*rais[ed] serious concerns that those representatives are in fact in control of the IFSA, so that the IFSA is neither independent nor otherwise able to conduct an effective regulatory program in accordance with international standards.*" The Advisory continued,

> The amendment of the Money Laundering (Prevention) Act, combined
> with changes in [Antigua's] treatment of its offshore financial

services sector, are likely to erode supervision, stiffen bank secrecy, and decrease the possibility for effective international law enforcement and judicial cooperation regarding assets secreted in [Antigua]. These changes threaten to create a 'haven' whose existence will undermine international efforts of the  United States and other nations to counter money laundering and other criminal activity, a concern of which the United States has repeatedly made the government of [Antigua] aware. The actions taken by the government of [Antigua] that weaken that nation's anti-money laundering laws and oversight of its financial institutions necessarily raise questions about the purposes of transactions routed into or out of [Antigua] or involving entities organized or domiciled . . . in [Antigua].

### 3.      Stanford Solidifies His Control over Antigua with Loans and Kickbacks

40.      Now firmly established in Antigua, Stanford Financial continued to strengthen its ties with the Antiguan Government and corrupt officials. In return for political cover, Stanford Financial became a major source of funding for the entire island, eventually loaning tens of millions of dollars to the Antiguan Government. Stanford Financial even bought the Antiguan newspaper, the Antiguan Sun, to influence the media. By 2004, the Antiguan Government owed over $87 million to Stanford Financial — nearly half the island's annual tax revenues — and certain of its loans were secured by the Government's tax revenues and medical fund.

41.      Stanford continued to leverage this influence through bribes, loans and kickbacks. Various companies within Stanford Financial loaned tens of thousands of dollars to various Antiguan Government officials. For example, Stanford Financial companies loaned $30,000 to the Antiguan Minister of Finance, Molwyn Joseph, in February 1992, evidenced by a Promissory Note. The Minister of Finance, *who during this time period was ultimately charged with overseeing SIBL*, never paid a dime on that loan.

42.      In 1996, Stanford General Counsel Suarez prepared several spreadsheets that detailed money Stanford had loaned to senior Antiguan Government officials, either through direct loans or through credit cards, as well as loans made to the Antiguan Government. This

document revealed that 11 senior Antiguan Government officials, including Lester Bird and Molwyn Joseph (who had received a new $100,000 loan from Stanford), owed Stanford a combined $140,000.

43.     Antigua's corruption and lax banking regulations is likewise borne out by the Plea Agreement entered by Stanford Financial CFO Jim Davis (the "Davis Plea"), as well as by the June 18, 2009 federal grand jury Indictment of *inter alia*, Allen Stanford, Laura Pendergest-Holt, and Leroy King ("King"), Stanford's good friend and former head of Antigua's financial regulator, the Financial Services Regulatory Commission (the "FSRC"), which replaced the previous IFSA. The Davis Plea and Indictment allege that for years, King — while acting as the CEO of the Antiguan FSRC — accepted bribes from Stanford and/or his associates in return for his assurance that the FSRC "looked the other way" and would not properly perform its regulatory functions or supervise SIBL. King even entered into a bizarre "blood brother" ritual with Allen Stanford in which he agreed to forever be bound to Allen Stanford. As part of this blood-brother relationship and bribery, King became Stanford's regulatory spy and "inside man" who relayed information to Stanford concerning the SEC's investigations of Stanford Financial and SIBL from 2005 all the way until 2009. This was all just part of the broader conspiracy to keep the Ponzi scheme alive by evading and obstructing regulatory oversight of SIBL's activities, at every turn, and in every country.

**4.     Stanford Financial Was Under Constant Investigation**

44.     Stanford Financial was under constant investigation by numerous U.S. government agencies, including the OCC, SEC, FBI, and U.S. Customs. For example, in addition to the SEC investigation of Stanford Financial that began in 2005, the FBI and U.S. Customs had been investigating Stanford's possible involvement in laundering drug money as far back as

1991. At one point, this investigation resulted in a U.S. Customs search of Stanford's private jet aircraft when he returned from the Caribbean. After this search, FBI documents indicate that "*the Stanfords proceeded to fire a number of employees whom they suspected might be providing information to the authorities.*"

45.     U.S. Customs documents from this same period described Guardian Bank as having "*constant cash flow*" from foreign depositors but "*no regulation of [the bank's] activities.*" Other documents note that U.S. Customs in San Antonio had taken an interest in the "*possible smuggling activities of principals in the Stanford organization.*"   FBI documents also reveal that Stanford had been under constant investigation for possible money laundering going back to 1989, and the FBI had even sent an agent to London as part of this investigation in September 1992. Stanford was well known to U.S. authorities and "stayed very prominently on the radar for years," says one former FBI agent who investigated Stanford. "There was a series of investigations. Obviously none of them ever ended in indictments. But we're talking various FBI field divisions, with multiple agents, then multiple agencies."

**5.     Stanford Financial Expands Sales into the United States**

46.     In 1996, Stanford entered the United States securities market by registering the newly formed SGC as an SEC-licensed securities broker/dealer and investment adviser. SGC's sole mission was to sell SIBL CDs to U.S. investors.

47.     At approximately this same time, Stanford Financial also expanded domestic sales of SIBL CDs to Latin American investors by establishing a representative office for STCL, its Antiguan offshore trust company.   In September 1998, Stanford Financial established the trust representative office in Miami, SFIS.   Stanford Financial expanded this SFIS model by opening additional SFIS "trust representative offices" in Houston and San Antonio in 2001 and 2005.

18

SFIS's sole mission was to sell SIBL CDs to trusts established by Latin American investors, including exclusively Mexican investors through the San Antonio office. The SFIS model proved very successful: Stanford Financial sold more than $1 billion in SIBL CDs through the Miami office alone.

48.     In 1998, Stanford Financial also established STC in Baton Rouge, Louisiana. STC provided trustee and custodial services that allowed SGC to sell SIBL CDs to its clients' IRA accounts.  This new IRA component of the Stanford Ponzi scheme eventually funneled hundreds of millions of dollars into Stanford Financial.

49.     In November 1998, SIBL filed a Regulation D ("Reg. D") exemption with the SEC. The exemption allowed SGC to sell SIBL CDs to "accredited investors" in the United States without registering the CDs as securities.  This initial exemption, which permitted a $50 million offering, planted the seed for Stanford Financial's exponential future growth.

50.     In 2001, SIBL filed an amended Reg. D exemption to increase the offering to $150 million. By 2003, Stanford Financial had printed and distributed some 30,000 Reg. D offering brochures to its FAs. In response to increasing sales to U.S. investors, SIBL filed two additional amendments in 2004 that increased the offering to $200 million and then $1 billion. These amendments set the stage for an intensive television advertising campaign, which Stanford Financial launched in 2005 to promote further sales to accredited investors in the United States.

51.     By March 2006, Stanford Financial had distributed 4,424 SIBL CD "Accredited Investor" packets to investors under the Reg. D offering. Finally, in November 2007, SIBL filed yet another Reg. D amendment to increase the offering to *$2 billion*.

     **D.**    **Stanford Financial Breeds Loyalty Through Exorbitant Compensation**

52.      From 2004 to 2008, Stanford Financial grew into a high-powered sales and

marketing machine. The different Stanford Financial sales offices competed with each other for CD sales, and developed team names like "Money Machine," "Aztec Eagles" (the Mexico team) and "Superstars." To market and sell SIBL CDs, Stanford Financial established a commission structure that provided huge incentives for its FAs, including those at SGC, to "push" the SIBL CDs on investors, all despite the fact that these same FAs did not know anything about the content of SIBL's portfolio or how SIBL was able to generate returns.  But, and despite their duties to their clients, the majority of the FAs were willing to overlook that problem because SIBL paid disproportionately large referral fees for the sale of its  CDs: SGC received a 3% referral fee for each CD sale, with 1% going to the FA who made the sale. The FAs were eligible to receive an additional 1% trailing commission throughout the term of the CD. Stanford also held "sales contests" and gave lavish gifts to FAs who sold the most CDs. Stanford Financial used these inflated commissions to recruit  established financial advisers, and to reward advisers who aggressively sold SIBL CDs to  investors. Of course, these incentives are extremely rare for bank CDs because they are  economically unsustainable.

### E.    Dissecting the Fraud

53.    The ultimate reality is that Stanford Financial was a massive Ponzi scheme run from Houston, Texas. In essence, Allen Stanford and his co-conspirators used the promise of SIBL CDs to lure investor money into Stanford Financial and then stole billions of dollars in assets from Stanford Financial companies for their own personal benefit. Substantial sums of these stolen funds were used to: (i) support the lavish lifestyles of Allen Stanford and his Ponzi insiders through unsecured personal "loans" to Allen Stanford; (ii) capitalize other entities wholly owned by Allen Stanford; and (iii) fund investments in speculative, illiquid, and high-risk assets, including private equity holdings and speculative investments in Antiguan real estate.

54.     In addition to stealing billions of dollars from Stanford Financial companies, Allen Stanford and his co-conspirators violated the Investment Company Act by failing to segregate the investor funds that SIBL received for the purchase of CDs. Instead, investor funds were commingled and then spread across various purported investments, which means Stanford Financial was actually operating as an unregistered investment "fund" that sold its internal securities product — the SIBL CDs — to investors. But Stanford Financial was never registered nor legally authorized to operate as an investment company in the United States. Furthermore, Stanford Financial's sales of SIBL CDs were unenforceable against investors under Section 47(b) of the Investment Company Act:

> A contract that is made, or whose performance involves, a violation of this [Investment Company] Act, is unenforceable by either party to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this Act . . . unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this Act.

15 U.S.C. § 80a-46.

55.     These facts were never disclosed to CD investors. Nor did Stanford ever disclose to investors that SIBL refused to allow anyone – even Stanford FAs - access to SIBL's investment portfolio information.  Instead, investors were consistently and uniformly told — both verbally and via promotional materials — that Stanford Financial was compliant, authorized, and regulated by the SEC and Financial Industry Regulatory Authority ("FINRA"), and backed by insurance coverage from the Securities Investor Protection Corporation ("SIPC") and Lloyd's of London. CD investors were never told that the acts of Stanford Financial and its unregistered investment company were void as a matter of law  under Section 47 of the Investment Company Act.  As part of this fraud, Stanford Financial also uniformly touted the high liquidity of SIBL's purported investment portfolio.  For example, in

21

its marketing materials distributed to  CD investors from at least 1995 through 2009, Stanford

Financial emphasized the importance of  the SIBL CD's liquidity. Under the heading "Depositor

Security," Stanford Financial's materials  state that the bank focuses on "maintaining the highest

degree of liquidity as a protective factor  for our depositors." None of that was true. Likewise,

Stanford Financial trained its FAs to stress  liquidity in their marketing pitches to prospective

investors, telling the brokers and advisers that  the "liquidity/marketability of SIBL's invested

assets" was the "most important factor to provide  security to SIBL clients . . . ."

56.     At the same time, Stanford ensured that no one knew – or could ever find out -

exactly what SIBL was investing in to generate returns on its portfolio.   Stanford enforced a strict

cloak of secrecy over the SIBL portfolio, and refused to allow anyone to gain access to it.   As

described herein, none of the Stanford FAs knew what was in the SIBL portfolio or how the

portfolio was invested.   See also SEC Opinion, attached as Exhibit 1.   Not even the Stanford

compliance officers were provided access to that information.   *Id.*   Of course Stanford Financial

never disclosed to the investors that SIBL was preventing investors, regulators, and even Stanford

FAs and compliance officers from gaining access to SIBL's investment portfolio information.

57.     With the SIBL portfolio cloaked in secrecy, the Stanford investors had no idea

what was going on behind the scenes.   As alleged in the Davis Plea and the criminal Indictment

of Allen Stanford and his  associates,  Stanford  and  his  CFO  Jim  Davis  fabricated  SIBL's

purported  investment  portfolio  and the returns it generated. Gilberto Lopez and Mark Kuhrt,

accountants  for  the  Stanford  Financial  companies,  fabricated  the  financial  statements  using

pre-determined  returns   on  investments  that  were  typically  provided  by  Stanford  or  Davis.

Lopez  and  Kuhrt  used  these   fictitious  returns  to  reverse-engineer  the  bank's  financial

statements  and  report  investment   income  that  SIBL  did  not  actually  earn.  The  information  in

SIBL's financial statements, created and issued by Hewlett & Co., bore no relationship to the actual performance or existence of SIBL's purported investments. SIBL's financial statements were prepared, drafted, and approved by Hewlett & Co. in conjunction with Stanford, Davis, Lopez and Kuhrt. As alleged by the SEC and the United States Department of Justice, Stanford and Davis also fraudulently inflated real estate and private equity holdings in SIBL's purported portfolio so the bank could maintain its minimum capital requirements.

### F.     Stanford Financial's House of Cards Finally Collapses

59.     In 2008, capital markets seized in a worldwide financial meltdown, and many anxious SIBL investors sought to liquidate their investments. By October 2008, this depositor "run" on SIBL had triggered liquidity constraints that frustrated Stanford Financial's ability to satisfy client requests for redemptions and funds transfers.

60.     On February 17, 2009, the SEC filed a Complaint against SGC and SIBL, as well as Allen Stanford and Jim Davis, in the U.S. District Court for the Northern District of Texas, alleging a "massive Ponzi scheme of staggering proportions." The SEC obtained an injunction to freeze the assets of Stanford Financial, and Ralph S. Janvey was appointed to serve as Receiver to liquidate the Stanford Financial companies.

61.     On June 18, 2009, Stanford, Pendergest-Holt, Lopez, Kuhrt and King were indicted on 21 counts, including wire and mail fraud, obstruction of an SEC investigation, and money laundering. Former Stanford Financial CFO Jim Davis subsequently pled guilty to several crimes, including conspiracy to commit securities fraud and conspiracy to obstruct an SEC proceeding. On March 6, 2012, Allen Stanford was convicted on multiple criminal counts, including wire fraud, mail fraud, obstruction of an SEC investigation, conspiracy to commit wire and mail fraud, conspiracy to obstruct an SEC investigation, and conspiracy to commit money

laundering.  On June 14, 2012, Stanford was sentenced to 110 years in prison for his crimes.

### G.    Stanford Financial's Regulatory Obstruction and Concealment Conspiracy

62.    Stanford Financial's successful efforts to completely shield SIBL, and more importantly, the SIBL portfolio, from regulators was a central pillar of the Stanford Ponzi scheme. Stanford Financial thwarted regulatory scrutiny in every country by concealing the true nature of its operations and SIBL's purported investment portfolio.

63.    After moving his fraud operations to his new safe haven in Antigua, beginning in 1991, Stanford, Davis, and others — including Defendants — embarked on a relentless conspiracy to obstruct regulatory scrutiny and conceal the true nature of Stanford Financial's global activities.   This obstruction-and-concealment conspiracy was essential to the Ponzi scheme's success, and it quickly became one of the scheme's main objectives. To accomplish this goal, Allen Stanford and his co-conspirators resorted to lies, trickery, bribery, "blood brother" rituals, regulatory corruption and obstruction, and other machinations to thwart regulators and protect the Ponzi scheme.

64.    Importantly for purposes of this lawsuit, Stanford wholly omitted to disclose to Plaintiffs and the other Stanford investors that he was engaged in regulatory obstruction and concealment to keep regulators like the SEC from obtaining access to SIBL's portfolio.

### 1.    The SEC First Suspected Stanford Was a Fraud in 1997

65.    According to the March 31, 2010 Report of Investigation from the SEC Office of Inspector General ("OIG"), the SEC's Fort Worth office first suspected that Allen Stanford and Stanford Financial were running a Ponzi scheme in 1997. From 1997 through 2004, the SEC's Fort Worth office conducted a broker/dealer examination of Allen Stanford and Stanford Financial four times (1997, 1998, 2002 and 2004), and in each examination, the staff questioned

the legitimacy of SIBL's CDs and concluded that SIBL's purported investment returns were "highly unlikely" given the bank's purportedly conservative investments.  Because of these doubts, the examination staff concluded – since 1997 - that Stanford Financial was likely a Ponzi or similar fraudulent scheme.

66.    The SEC's first broker/dealer examination occurred in 1997 after the Fort Worth staff identified SGC as a risk and target for examination. In August 1997, after only six days of field work examining SGC, the examiners concluded that SIBL was misrepresenting its CDs as "safe and secure" investments. The examiners believed the SIBL CDs' burden of high interest rates and substantial "referral" fees to SGC were simply too great to be supported by SIBL's purportedly low-risk investment portfolio. In fact, the Assistant District Administrator of Fort Worth's examination program concluded that the CDs' interest rates, SIBL's claimed investment returns, and SIBL's purportedly conservative investment approach all served as "red flags" of a Ponzi scheme. The Fort Worth Branch Chief believed the CDs' purported returns were "absolutely ludicrous," and further concluded that SGC's substantial "referral" fees indicated the CDs were not legitimate.

67.    The Fort Worth examination staff were also concerned that SGC did not maintain books and records for CD sales. Moreover, SGC purported to have no actual information about SIBL or the bases supporting the CDs' generous interest rates, even though SGC's FAs were recommending SIBL CDs to investors and receiving substantial "referral" fees for doing so.

68.    In May 1998, the Commission's Enforcement Division opened a Matter Under Investigation ("MUI") on Allen Stanford and his companies. In June 1998, while the Stanford MUI was still open, the SEC's Fort Worth office also began an investment-advisor examination of SGC. The investment-advisor examiners found that SIBL's "extremely high interest rates and

extremely generous compensation" to SGC, coupled with SGC's "extreme[] dependen[ce] upon that compensation to conduct its day-to-day operations," was "very suspicious." The investment-adviser examiners also noted SGC's **complete lack of information regarding SIBL's investment portfolio**.  In fact, when examiners asked SGC to produce all of its due diligence information concerning SIBL CDs, SGC claimed it did not even have access to such information. In sum, the examiners concluded that SGC had "virtually nothing" to provide a "reasonable basis" for recommending SIBL CDs to its customers.[3]

69.    In November 2002, the SEC's Fort Worth office conducted another investment-advisor examination of SGC.  The examiners identified the same red flags as before: SIBL's "consistent, above-market reported returns," which were "very unlikely" to be achieved with "legitimate" investments, and the high commissions earned by SGC's FAs for selling SIBL CDs that they failed to adequately understand. According to the 2002 Examination Report, the examiners noted that *"[t]here was no indication that anyone at SGC knew how its clients' money was being used by SIBL or how SIBL was generating sufficient income to support the above-market interest rates paid and the substantial annual three percent trailer commissions paid to SGC."*  The examiners concluded that SGC's failure to conduct sufficient due diligence concerning SIBL CDs violated Section 206 of the Investment Advisers Act. The Examination Report also concluded that Stanford Financial's website constituted a "general solicitation" in violation of SIBL's Reg. D exemption because the site provided all the information that clients needed to purchase SIBL CDs, including contact information for SGC representatives.

70.    On December 19, 2002, the examiners sent a deficiency letter to SGC's Chief Compliance Officer, Jane Bates. The letter informed SGC that its due diligence file for SIBL CDs lacked sufficient information for SGC to recommend such investments to clients. The letter

---

[3] OIG Report at 18, 44.

requested that "SGC perform and document substantial additional due diligence to determine whether [SIBL's] use of proceeds . . . would indicate that the investment is suitable for [SGC's] advisory clients."

71.    In response to this letter, SGC "markedly changed its previous representations to the SEC concerning its due diligence regarding [SIBL's] CDs."   In a letter dated January 23, 2003, Bates claimed that SGC's Chief Operating Officer and Chief Compliance Officer regularly visited the bank, participated in quarterly calls with the bank's CFO, and received quarterly information concerning the bank's portfolio allocations, investment strategies, and top five equity and bond holdings. One examiner thought these revelations were another red flag given SGC's previous denials, and he believed Bates was either "out of it" or "ly[ing]."[4] In a letter dated February 13, 2003, the examiners responded to SGC's marked change of heart, criticizing SGC's use of "hindsight" due diligence and highlighting SGC's failure to provide requested information concerning SGC's sales of SIBL CDs.

72.    In 2003, the SEC also received two letters from private citizens that raised concerns about Stanford Financial. On August 4, 2003, the Commission received a letter comparing the "striking similarities" between a recently exposed Ponzi scheme — believed to be the $425 million InverWorld fraud — and Stanford Financial's operations. In particular, the letter noted how the organizations avoided regulatory oversight by depositing investor funds in offshore entities and devising a "Byzantine corporate structure" that used domestic entities for "administrative services" only.   On October 10, 2003, the NASD forwarded a letter from a former Stanford FA who questioned SIBL's true investment activities and believed Stanford Financial was a "LINGERING CORPORATE FRAUD SCANDAL PERPETUATED AS A MASSIVE PONZI SCHEME." (emphasis in original).

---

[4] OIG Report at 51-52.

73.     In October 2004, the SEC's Forth Worth office initiated another broker/dealer examination of SGC, this time for the specific purpose of sparking a potential enforcement action. In their Examination Report, the examiners found SGC to be a "high regulatory risk" and suspected that SIBL's CD offerings "may in fact be a very large [P]onzi scheme, designed and marketed by [SIBL] and [SGC] to lull investors into a false sense of security by their claims that [SIBL] products are similar to traditional U.S. bank CDs." The examiners' "**suspicion [was] fueled by SGC's apparent inability and [SIBL's] refusal to provide requested documents regarding the CDs, including the actual uses of the monies raised.**" The examiners further noted their inability to force SIBL to provide "the necessary documents to either verify or allay [these] suspicions." The Report also discussed the examiners' belief that SGC was possibly violating its fiduciary duty to clients and the NASD's  suitability  rule, as well as Section 206 of the Investment Advisers Act, Section 5 of the Securities Act of 1933, and Rules 10b-5 and 10b-10 of the Securities Exchange Act of 1934.[5]

74.     On November 2, 2004, SGC responded to an October letter from the SEC regarding SGC's due diligence of SIBL's investment portfolio. The letter described SGC's due diligence efforts but acknowledged that SGC "[did] not have access to the detailed portfolio mix of [SIBL's] assets." On December 21, 2004, the SEC examiners responded to SGC with an additional request for documents, including information concerning SGC's receipt of referral fees and details of SIBL's investment portfolio. In a letter dated January 6, 2005, SGC reiterated that it did not have the "specifics" regarding SIBL's investments.

75.     On or about April 15, 2005, the broker/dealer examiners officially referred the Stanford case to the SEC's Enforcement Division in Fort Worth. According to the examiners' 2005 Enforcement Referral memo, the evidence suggested SGC and SIBL "may be violating the

---

[5] OIG Report at 70-74.

securities laws," namely that: (i) SGC may be selling unregistered securities without a valid exemption; (ii) SGC and SIBL may be misrepresenting the unregistered offering; and (iii) SIBL "may be engaging in a fraudulent scheme (possibly either a money laundering and/or a Ponzi scheme) through the sales of the unregistered securities."

76.     According to the memo, SIBL "refuses to provide the staff with sufficient information to dispel [these] concern[s]." The memo also noted SGC's continued representations to the SEC that SGC could not get any information from SIBL concerning the composition of SIBL's portfolio or its investments, and that SIBL claimed Antiguan bank secrecy laws prevented the bank from even producing such information to SGC.

> SGC claims that it keeps no records regarding the portfolios into which [SIBL] places investor funds and that it cannot get this information from [SIBL]. Indeed, SGC has related to the Staff that [SIBL] claims it cannot divulge the specifics of how it has used customers' deposits, based (variously) upon the bank secrecy laws of Antigua and [SIBL's] own internal "Chinese Wall" policies with SGC.[6]

77.     That same day, April 15, 2005, the Enforcement Division opened a new MUI that eventually led to a formal order of investigation. The enforcement staff promptly contacted the Office of International Affairs to help the Commission obtain SIBL's records in Antigua.[7]

78.     On May 19, 2005, SGC's Rep Poppell provided additional information to the SEC regarding SGC's knowledge of SIBL's investment portfolio:

> It is important to note that SIBL utilizes [independent] portfolio advisors all over the world. . . . SGC is not privy to the names of the securities purchased by [SIBL's] independent portfolio advisors, most of which have full discretion to manage their designated portion of the Bank's portfolio. . . . [But] SIBL did open a managed account with Stanford Asset Management in April 2005, and we have attached the most recent statement indicating the corporate bond holdings. Because this is managed by SGC's investment adviser, we have knowledge of those securities purchased.

---

[6] OIG Report at 74, 81-82.
[7] OIG Report at 83-85.

79.     While Poppell's disclosure to the SEC was misleading at best, his admission that SGC had at least *some* knowledge of SIBL's investments would later be contravened by Defendant Sjoblom's stance with the Commission that SGC had *no* knowledge of SIBL's investments.

## 2.     Stanford Financial's Anti-Regulatory Conspiracy Gains Urgency

80.     On June 9, 2005, the SEC's Office of International Affairs sent a letter to Leroy King regarding the Stanford investigation. The letter described the SEC's suspicions of fraud and "a possible Ponzi scheme by [SIBL]," including its concerns that Allen Stanford or Stanford Financial were misappropriating customer funds. The letter requested the FSRC's cooperation in helping the SEC obtain SIBL's investment portfolio records in Antigua. When King received the letter, he immediately forwarded a copy directly to his "blood brother," Allen Stanford.

81.     An enforcement staff member thereafter called King to discuss the SEC's concerns.  During the call, King rejected the SEC's allegations as mere "innuendo." He questioned whether the SEC's concerns implicated criminal conduct and declined to provide assistance. When the SEC staff member told King that some people believed Allen Stanford was stealing the investors' money, King demanded to know the people's identities (presumably so he could inform Allen Stanford). King formally responded to the SEC request in a letter dated June 21, 2005, where he bluntly informed the Commission that the FSRC believed "any further investigation of [SIBL's] 'possible' fraudulent activities is unwarranted."[8]

82.     On that same day, June 21, 2005, the SEC sent an investigatory referral letter to the National Association of Securities Dealers ("NASD") (now Financial Industry Regulatory

---

[8] On or about July 8, 2005, the SEC discovered that Leroy King received his position at the FSRC based on Allen Stanford's recommendation, and that King was a member of the corrupt Lester Bird "gang." The SEC also learned that Allen Stanford wielded enormous power in Antigua, in part through his ownership of Antigua's newspapers, airport, several restaurants, and several other properties. In short, Stanford "was the money guy" in Antigua.

Authority, or "FINRA"). The letter outlined the SEC's concerns, including its suspicions that: (i) Stanford Financial was committing securities fraud; (ii) SIBL's CDs constituted "securities" under U.S. law; and (iii) Stanford Financial appeared to be operating an illegal unregistered investment company (*i.e.*, a mutual or hedge fund) in the United States. The letter informed the NASD that SGC "claims that it keeps no records regarding the portfolios into which [SIBL] places investor funds and that it cannot get this information from [the bank,] . . . [which] suggests [SGC] may be violating NASD Rule 2310 (Suitability)." The letter also reported that as of 2004, SGC had earned ***63%*** of its revenues from SIBL CD sales, and had sold at least ***$1.5 billion*** in CDs to investors. The NASD promptly opened its own investigation of Stanford Financial.

83.     The bottom line is that from 1997 to 2005, the SEC's staff in Fort Worth strongly suspected that Allen Stanford and Stanford Financial were operating some kind of fraud or Ponzi scheme. See OIG Report at 103 ("Everybody, everybody believed that this was probably a Ponzi scheme."). In response to the SEC's expanding investigation, and as alleged in the Jim Davis Indictment, Allen Stanford, Jim Davis, and their co-conspirators blocked and obstructed the Commission's investigation at all turns, beginning in at least the summer of 2005 and ending shortly after the SEC finally seized Stanford Financial in February 2009. The Indictment alleges that from June 2005 through March 3, 2009, Stanford, Davis, Pendergest-Holt, King and others (collectively, the "Stanford Conspirators") engaged in a conspiracy to "corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede, in whole or in part, a pending proceeding before … the SEC, in violation of 18 U.S.C. § 1505." According to the Indictment, the object of this conspiracy was to obstruct the SEC's investigation of Stanford Financial and SIBL in order to "perpetuate and prevent detection of an ongoing fraud" so that

Stanford Financial and SIBL could "continue receiving economic benefits from the fraud."

84.     With the advice, cooperation, and substantial assistance of Defendants, the Stanford Conspirators developed an obstruction strategy to prevent the SEC from ever obtaining documents regarding SIBL's investment portfolio. Their strategy became a shell game: Stanford Financial and Defendant Sjoblom claimed that Antiguan law prohibited SIBL from producing its documents, and that only the FSRC could provide them, but the Stanford Conspirators and Defendant Sjoblom knew that Leroy King would never allow the FSRC to produce those documents to the SEC.

### H.     Defendants' Role in Shielding and Perpetuating the Fraud

### 1.     Sjoblom Gains Early Knowledge of Stanford's Fraud

85.     In June 2005, Stanford Financial formally retained Sjoblom. Sjoblom was at that time employed in the Washington, D.C. office of Chadbourne & Parke LLP. He had been a high-ranking SEC enforcement lawyer for 20 years before joining Chadbourne, and he personally knew many of the SEC lawyers involved in the investigation.

86.     On June 9, 2005 — *the very same date of the SEC's first letter to Leroy King regarding Stanford Financial* — Sjoblom received a call from Chadbourne's Talbert Navia, a good friend of Stanford Financial's General Counsel Mauricio Alvarado, regarding Stanford Financial's potential retention of Chadbourne and Sjoblom for the SEC investigation.[9]  The next day, June 10, 2005, Navia and Sjoblom held a teleconference with Alvarado, who described Stanford Financial's business operations and its issues with the SEC, including the SEC's belief that Stanford Financial was a *Ponzi scheme*. According to Sjoblom's notes, Alvarado told them

---

[9]     Stanford Financial's first choice for this assignment was Spencer Barasch, who had recently retired from the SEC as the Enforcement Director of the Fort Worth office, but the SEC's ethics office disqualified Barasch from representing Stanford Financial in 2005. However, Barasch would go on to help Stanford Financial and Sjoblom in 2006.

that he wanted Sjoblom to "stop [the SEC inquiry] now."

87.     Sjoblom went to work immediately, starting with his own due diligence of Stanford Financial. On June 15, 2005, Sjoblom obtained a copy of the "Response and Counterclaim" filed by Charles Hazlett against SGC in an arbitration proceeding with the NASD. Hazlett, a former FA for SGC, described how SGC pressured him to sell SIBL CDs, how SIBL refused to permit the disclosure of its financial information, and how SGC asked him to resign for simply asking questions about SIBL's investment portfolio. Notably, Hazlett also described how he received a $100,000 car as a bonus for selling more than $10 million in SIBL CDs in a single quarter.

88.     On June 29 and 30, 2005, Sjoblom traveled to Stanford Financial's global headquarters in Houston, Texas. While in Houston, he reviewed Stanford Financial's offering materials and disclosures to U.S. accredited investors for the SIBL CD program. He also interviewed several SGC FAs and other personnel, including SGC's top managers Jay Comeaux, Alvaro Trullenque, Jason Green, and Danny Bogar. Sjoblom asked each one of them if they knew how SIBL invested SGC's client funds, but _**none**_ of them could tell Sjoblom anything about SIBL's portfolio other than the general categories and asset classes disclosed in SIBL's annual reports. When discussing the bank, Comeaux, Trullenque, and other FAs also told Sjoblom that SIBL was **_not_** a commercial bank because it did not earn money through traditional lending. Instead, they told him that SIBL was an investment bank. For example, Comeaux referred to the bank as "our affiliate [SIBL], a private investment bank," and he explained that SIBL was not a commercial bank because it did not issue commercial loans. Similarly, FA Trevor Ling described SIBL as a "classic" investment bank that invested client funds and guaranteed a rate of return. Ling and Trullenque also **told Sjoblom that SIBL's**

**portfolio managers were located in Memphis, Tennessee**.  When discussing SIBL's CDs, FA Doug Shaw told Sjoblom that these investments were more like corporate bonds and were simply "called" CDs.

89.     SGC's FAs also told Sjoblom about the 1% trailing commission they received on every million dollars that their clients invested in SIBL CDs, and they discussed the contests that Stanford Financial used to promote CD sales. Jason Green told Sjoblom that he was "Team Captain" for SGC's U.S. CD sales team, which competed against foreign CD sales teams from Venezuela and other countries.  Danny Bogar also told Sjoblom about Stanford Financial's "Top Producers Club" for FAs who sold more than $1 million in new SIBL CDs for the year.

90.     On June 30, 2005, Sjoblom met with Barbara Fortin, Stanford Financial's insurance risk manager, who explained SIBL's insurance policies from Lloyd's of London. Sjoblom's notes show that SIBL's insurance provided up to $20 million in coverage for SIBL's deposits in correspondent banks but no insurance is listed for the CD investors' deposits at SIBL. Sjoblom also met with Stanford Financial compliance officer Rep Poppell, who described the SEC's examination and Stanford Financial's compliance procedures for SGC.  **According to Sjoblom's own notes, Poppell – who was Stanford Financial's compliance officer - told the SEC "ad nauseum" that he did not know how SIBL's money was invested.**  Poppell also told Sjoblom that SEC enforcement attorney Jennifer Brandt told him the SEC wanted to determine whether SIBL's CD program was a Ponzi scheme.

91.     On August 9, 2005, Sjoblom asked his associate, Ben Ogletree, to contact Jennifer Brandt at the SEC and inquire about the status of the Stanford investigation.   That same day, Ogletree reported back to Sjoblom that the SEC proceeding had become a "formal" investigation.  Ogletree told Sjoblom said the SEC wanted to obtain SIBL's investment records

"showing how the money was invested," but SGC had taken the position that it "had no access to such records and thus cannot provide them." He also told Sjoblom that Brandt wanted to know if Chadbourne represented SGC, SIBL, or both entities. Sjoblom told Ogletree that he represented both SGC and SIBL, but he advised Ogletree not to inform the SEC because"[*m]aybe we keep [the SEC] from getting the bank records by not representing [SIBL].*" (emphasis added). Thus Sjoblom's intent to help Stanford prevent the SEC from ever gaining access to the SIBL portfolio was present since the very beginning of his relationship with Stanford.

92.     On August 9, 2005, Sjoblom traveled to Antigua to continue his due diligence, and he met with Allen Stanford, Stanford Financial's Chief of Staff Yolanda Suarez, and SIBL President Juan Rodriguez-Tolentino. During Sjoblom's meeting with Allen Stanford, Stanford revealed his plans for the massive real estate development projects underway in Antigua, including the Island Club, which was Stanford's dream project of a massive resort in Antigua and adjacent islands for wealthy tourists. According to Sjoblom's handwritten notes from this meeting, the projects were funded by Stanford Financial. Sjoblom's notes demonstrate that by August 9, 2005, Sjoblom was acutely aware of Stanford Financial's substantial investments in speculative Antiguan real estate. His notes also reveal Sjoblom's knowledge that SIBL also held real estate investments in Antigua and Venezuela.

93.     The next day, August 10, 2005, Sjoblom toured SIBL with its President, Juan Rodriguez-Tolentino, who described SIBL's history and the Antiguan regulatory environment governing SIBL. Stanford Financial CFO Jim Davis joined them for lunch, where Rodriguez-Tolentino told Sjoblom that SIBL's main clients (at least 90% at that time in 2005) were from Latin America, because Latin Americans did not like market risk and thus preferred conservative instruments like CDs.

94.     After lunch, Sjoblom met with Davis and Stanford Financial's Chief Investment Officer Laura Pendergest-Holt. Sjoblom asked them who managed SIBL's investment portfolio and where SIBL maintained its accounting records. Davis told Sjoblom that SIBL's "First Tier" (or "Tier 1") investments consisted of cash held in correspondent accounts.  The Tier 1 assets were overseen by Patricia Maldonado, who was Stanford Financial's Global Treasury Manager in *Houston, Texas*.

95.     Davis also told Sjoblom that SIBL's "Second Tier" (or "Tier 2") investments were managed by roughly 20 managers located in Canada and Europe, and monitored by Stanford Financial research analysts in Memphis, Tennessee. Davis said the analysts in Memphis worked for Stanford Financial Group Company under a management agreement with SIBL.

96.     Davis also informed Sjoblom that SIBL's "Third Tier" (or "Tier 3") investments were managed by European advisors and *monitored by Jim Davis and Allen Stanford*.   Davis said the Tier 3 assets were longer-term credits such as bonds and notes issued by countries and international corporations. Davis and Pendergest-Holt also told Sjoblom that SIBL did *not* invest in private equity because the investments were illiquid, and that *SIBL's entire portfolio could be converted to cash in 120 days.*   Finally, Davis and Pendergest-Holt told Sjoblom that SIBL's financial statements were audited by Hewlett & Co., a local accounting firm in Antigua.

97.     Notably, Davis and Pendergest-Holt never told Sjoblom anything about the *specific investments* in SIBL's portfolio, even though they were responsible for monitoring most of those investments. Instead, they simply provided general descriptions of asset classes (i.e., nothing more than the information that was already disclosed in SIBL's offering materials). Sjoblom conspicuously failed to press this issue even though he knew that the primary focus of the SEC's investigation was to examine SIBL's actual investment holdings, and he knew SGC

had told the Commission that this information was unavailable. But the information was not unavailable. Davis and Pendergest-Holt had confirmed that SIBL's investment information was available in the United States—because SIBL's investments were monitored by Stanford Financial personnel – including Stanford and Davis - in Memphis and Houston.

98.     Later that afternoon, Rodriguez-Tolentino took Sjoblom to visit Leroy King, the head of Antigua's FSRC, who purportedly served as an "independent" regulator on the island. **Shockingly, King proceeded to tell Sjoblom about the SEC letter he recently received regarding the Commission's Stanford investigation. King also told Sjoblom that the FSRC would *not* produce any documents concerning SIBL to the SEC.** Sjoblom's notes from this meeting reflect King's comment that under Antiguan law, King would not permit SIBL's records to be turned over to the SEC unless he and the FSRC first found that SIBL was engaged in fraud or crime. King also told Sjoblom that he might show the FSRC's SIBL examination reports to the SEC, but that ***King would not provide the SEC with any of the underlying or supporting documents showing how SIBL's portfolio was invested***.

99.     Sjoblom's notes demonstrate that as of August 10, 2005, Sjoblom knew the FSRC would *not* produce SIBL's portfolio records to the SEC absent its own finding that SIBL had engaged in fraud or crime. He also knew the FSRC was not truly independent from Stanford Financial because King had openly discussed his confidential communications with the SEC concerning SIBL. **Sjoblom's file also reveals that he received a copy of the FSRC's draft examination report for SIBL, dated March 7, 2005, which was marked "DRAFT" and "CONFIDENTIAL."** It is not clear when Sjoblom actually obtained this draft, confidential report from SIBL's "independent" regulator. But if he received the report during his meeting with King, then Sjoblom also knew on August 10, 2005 that the FSRC was beholden to, if not

outright controlled by, Stanford. There is simply no other credible explanation for King's disclosure of the FSRC's confidential correspondence with the SEC regarding SIBL, and his provision of a draft, confidential SIBL examination report to the attorney who represented SIBL. In short, Sjoblom was on notice that Stanford Financial had the FSRC in its pocket.

100.    By this time, Sjoblom had also gathered critical information about Stanford Financial's business operations. He knew that Stanford Financial's securities marketing and sales operation was based in Houston, Texas. He knew that SIBL's Tier 1 and Tier 2 assets were monitored by Stanford Financial personnel in Houston and Memphis, and that Jim Davis, who was based in the United States, monitored SIBL's Tier 3 assets with Allen Stanford. He also knew that SIBL CDs were sold to domestic investors through SGC, which served as Stanford Financial's registered investment adviser and broker/dealer in the United States. More importantly, he knew that SGC was recommending SIBL CDs to investors even though SGC's key managers and FAs did *not* know – and were prevented from knowing - how SIBL invested depositor funds.  Moreover, he knew that SGC was actively misleading the SEC regarding the availability of SIBL's portfolio information.  Sjoblom also knew that SIBL used Antigua's purported "privacy laws" to keep its purported investments secret from the SEC  even though Stanford Financial had access to SIBL's portfolio information in Memphis and Houston.

101.    Sjoblom also knew that SIBL CDs offered returns that were far greater than prevailing market rates, and that Stanford Financial aggressively incentivized CD sales by paying above-market commissions and sponsoring numerous sales contests. Sjoblom also knew that these excessive CD rates and lucrative sales incentives — when coupled with the secrecy surrounding  SIBL's investment portfolio and Stanford Financial's refusal to provide requested information — caused the SEC to suspect that Stanford Financial was operating a massive

fraud or Ponzi scheme.   Finally, Sjoblom also knew that Stanford Financial was investing substantial sums of money in speculative and undisclosed Caribbean real estate development projects.

102.    These facts demonstrate that as of August 2005, Defendant Sjoblom — a former SEC enforcement lawyer with 20 years of experience investigating securities and investment fraud — knew that Stanford Financial was, at best, committing securities fraud through an unregulated investment company based in Houston, Texas that issued securities from an offshore bank in the most corrupt fraud haven in the Caribbean.   ***At worst, Sjoblom already knew that Stanford Financial was running a fraud or Ponzi scheme.***

103.    Instead of declining the engagement, however, Sjoblom eagerly agreed to help. After concluding his due diligence, Sjoblom reported back to Talbert Navia and agreed to represent Stanford Financial. On August 23, 2005, Sjoblom called the SEC and told the Commission that SIBL would not voluntarily produce any documents and that the SEC did not have jurisdiction over SIBL.

104.    On August 24, 2005, Sjoblom traveled to Memphis to learn more about how SIBL's investments were managed. There he met again with Pendergest-Holt. His notes from this meeting detail her explanation that Stanford Financial Group Company provided SIBL with accounting, legal, financial and treasury management services from the U.S. through services agreements between the two companies. Pendergest-Holt told Sjoblom that Stanford Financial could provide SIBL's investment *parameters* to the SEC but it could not provide its actual investment positions because this information was ***proprietary***.   Of course, Sjoblom knew — as would any lawyer with his experience and expertise — that "proprietary" information was fully discoverable by the SEC and could not be withheld.   Pendergest-Holt also explained that SIBL

was not really a mutual fund because it issued a CD to investors with a "guaranteed" rate of return, thus SIBL had "taken away all the risk" that an investor would otherwise bear when holding mutual fund shares.

105.    She also explained to Sjoblom how SIBL's investment positions were confidential under Antiguan law and could not be disclosed. She said the FSRC, by law, could not share its bank examination reports with foreign regulators absent a finding of fraud or criminal activity. She also told him that as long as SIBL invested depositor funds within the parameters set by the Board, then there could be no fraud or criminal act.   At this point, Sjoblom made a note to himself: a **question on whether Antiguan law *really* provided confidentiality for a bank's investment portfolio information**.   Sjoblom thereafter intentionally, recklessly or negligently failed to further examine or answer that question, and as described further below, he still questioned whether this was true in January and February 2009.

106.    Sjoblom immediately searched for ways to justify SIBL's refusal to provide its portfolio investment information to the SEC. On August 25, 2005, he asked Chadbourne lawyers Ken Weitzman and Richard Martinelli to advise him on whether trade secret law would justify SIBL's refusal to provide investment information to the SEC. Weitzman and Martinelli advised Sjoblom that even if SIBL's investment positions were trade secrets, they could always be turned over to the SEC pursuant to a Protective Order, and the SEC's own regulations protected confidential materials.

107.    On August 29, 2005, the SEC sent a letter to Sjoblom requesting Stanford Financial's voluntary production of documents concerning SIBL's CD program. In a letter dated September 12, 2005, Sjoblom responded that Stanford Financial would like to cooperate with the SEC's request but **Antiguan confidentiality laws prevented SGC or SIBL from producing**

**SIBL's portfolio-related documents**. Sjoblom's letter suggested that the SEC request such documents from Antigua's FSRC even though Sjoblom knew that King would reject the SEC's requests. Sjoblom's letter also stated that the SEC lacked jurisdiction over SIBL, as SIBL's CDs did not qualify as securities given the FSRC's "comprehensive regulation" and SIBL's "extensive insurance to protect against risk of loss." Of course, Sjoblom already knew that Stanford Financial's "extensive insurance" amounted to just $20 million and that the FSRC lacked the independence to effectively regulate SIBL and was in reality controlled by Stanford.

108.    That same day, September 12, 2005, the SEC sent a letter to SGC President Jay Comeaux regarding SGC's numerous violations of law. The SEC claimed that SGC's Disclosure Statement for U.S. accredited investors was materially misleading concerning the risks associated with SIBL CDs, and that SIBL's marketing brochures for foreign investors failed to disclose any risk at all.  Instead, SIBL's disclosures falsely portrayed SIBL CDs to be as safe and secure as FDIC-insured CDs issued by U.S. banks. SGC was also violating the NASD's suitability rules by recommending the CDs to investors when SGC lacked even basic information concerning SIBL's portfolio, which SGC needed to assess the risk level associated with SIBL CDs. The SEC further alleged violations related to the excessive "referral" fees paid on CD sales, and the failure to disclose these fees and SGC's sales contests to investors.

109.    The next day, September 13, 2005, Sjoblom emailed a copy of SIBL's marketing brochure to fellow Chadbourne partner Peter Ingerman and asked him to examine the brochure under Reg. D to see if there were any problems. Based upon his review of the brochure, Ingerman responded that Stanford Financial "appear[ed] to be promoting a brokerage or investment advisory service," and he asked Sjoblom "what securities are being sold . . . ?" Sjoblom responded that Stanford Financial was selling CDs from an offshore bank through its

broker/dealer affiliate in Houston. Sjoblom noted that Stanford Financial did not believe the CDs were securities. Ingerman promptly responded, "*I am not sure why they think these CDs are **not** securities.*" (emphasis added)

### 2.   Sjoblom's Misrepresents Material Facts and the Law to the SEC

110.   On September 14, 2005, Sjoblom advised Chadbourne associate Jennifer Arnold that, vis-a-vis the SEC, "*we need to fight back, hard.*"   With the help of Arnold and fellow Chadbourne lawyer Dennis Dumas, as well as Stanford Financial's Mauricio Alvarado and Yolanda Suarez, Sjoblom spent the next three weeks crafting a massive response letter to the SEC.   Sjoblom's notes indicate that the letter's primary objectives — as agreed by Sjoblom, Allen Stanford, Suarez and Alvarado — was to prevent the SEC investigation from becoming a "formal order of investigation," "contain it at the Ft. Worth office," and "do it rapidly, before enforcement takes off."

111.   The final draft of Sjoblom's 36-page letter was forwarded to the SEC on October 3, 2005, with a copy to the NASD's Dallas office. Sjoblom's letter flatly rejected the SEC's allegations of fraud and argued that the Commission lacked jurisdiction over SIBL's CD program because the CDs did not constitute "securities" under U.S. law.   Sjoblom stated that if SIBL became insolvent, SIBL's CD holders were "*virtually guaranteed payment in full*" because they were protected by Antigua's comprehensive banking regulations and SIBL's excess capital and supplemental insurance coverage.[10] Incredibly, Sjoblom also stated that an investment in SIBL was actually *safer* than investing in a U.S. bank.

112.   At the time Sjoblom sent this letter, he already knew that SIBL had grossly inadequate insurance to protect against the risk of loss from its ***own*** insolvency. He also knew

---

[10]  In early drafts, Sjoblom also claimed that SIBL's insurance coverage "include[ed] the protection of SIBL depositors" which was "similar in substance to FDIC insurance."

that Antigua's FSRC lacked the independence necessary to regulate SIBL. Indeed, in addition to Sjoblom's knowledge that Leroy King had provided highly confidential information and documents to him, Sjoblom also knew about Allen Stanford's key role in developing Antigua's banking regulations, a fact that shreds any remaining doubt about the legitimacy of SIBL's purported regulator in Antigua.[11]  Sjoblom had no reasonable basis to assert that SIBL's CDs were not securities under U.S. law.  Indeed, his law firm partner, Peter Ingerman, had already told Sjoblom that he did not see how SIBL's CDs were *not* securities.

113.   After Sjoblom sent his letter to the SEC, things went quiet on the SEC front for a while. Then on January 13, 2006, the NASD sent a letter to SGC raising concerns about SIBL's sales brochures, its "accredited investor" disclosures, and SGC's due diligence on SIBL for investment-suitability purposes. Stanford Financial's Alvarado once again requested Sjoblom's assistance in responding to the NASD. Sjoblom helped SGC prepare its response letter, which echoed many of his arguments to the SEC, including his unfounded claim that Antiguan law provided "extensive protection" for depositor funds and that  SIBL's insurance provided "extensive coverage and protection against risk of loss." During the drafting process, Sjoblom emailed Alvarado on January 31, 2006 to warn him that the NASD may request SIBL's filings with the FSRC. Sjoblom reminded Alvarado that these reports were "confidential."  On February 3, 2006, Rep Poppell sent SGC's response letter to the NASD.

### 3.   Sjoblom Witnesses Allen Stanford's Order to "Paper the Files"

114.   On February 3, 2006, Stanford Financial compliance officer Lena Stinson emailed Sjoblom for his advice on a new 20th anniversary marketing brochure for SIBL. Sjoblom cautioned Stinson that Stanford Financial needed to avoid trouble with the SEC because it

---

[11] Early drafts of Sjoblom' letter specifically discuss Allen Stanford's role in spearheading the development of Antigua's "comprehensive" banking regulatory system. This discussion was eventually deleted by Stanford Financial personnel and did not appear in the final draft of Sjoblom's letter to the SEC.

was under investigation. He also informed Stinson that he wanted a Chadbourne securities partner to review the brochure.

115.    On February 16, 2006, after apparently conferring with "other securities lawyers at Chadbourne," Sjoblom responded to Stinson with his comments on SIBL's new brochure. He advised — *for the first time* — that if SIBL's CDs turned out to be securities, then SIBL could not rely on its Reg. D exemption "for use of general solicitation materials" (which is apparently how Chadbourne's "other securities lawyers" viewed the SIBL brochure). Additionally, he advised that because SIBL did not limit its CD sales, this "general solicitation" would allow the SEC to "undoubtedly succeed in any enforcement case to establish liability" for the sale of unregistered securities. Sjoblom further advised, *also for the first time*, that regardless of whether the CDs were securities, SGC might have issues regarding the suitability of its clients' investments in SIBL CDs. Finally, Sjoblom advised that "*because Allen Stanford owns and/or controls all of the entities involved in the sale of the CDs, it will be difficult to argue that SIBL (the issuer of the brochure) must be viewed and treated as separate and distinct from SGC.*"[12] Sjoblom concluded his email by advising Stinson that if Allen Stanford used this brochure as solicitation material, it would likely expose Stanford Financial to more "battles on a larger and wider scale," a risky strategy given that Stanford Financial was already facing a formal SEC investigation as well as deficiency letters from the NASD.

116.    Allen Stanford promptly intervened, and in a February 16, 2006 email to both Stinson and Sjoblom, Stanford asked for ways to avoid these compliance issues. When addressing the due-diligence-and-investment-suitability problem, **Stanford ordered Stinson to "get down to Antigua and cover our rears with tons of due diligence paperwork"** —

---

[12] Of course, these statements are completely inconsistent with Sjoblom's representations to the SEC.

*i.e.*, paper the files. Sjoblom's advice to Stanford Financial reveals his knowledge that SIBL was already generally soliciting CD sales in violation of Reg. D, and as a result, SIBL was selling unregistered securities and could be liable for rescission of all CD sales. Furthermore, Sjoblom had now heard directly from Allen Stanford that the solution to SGC's compliance and suitability problems was to merely "cover our rears" with paperwork.

**4.       Sjoblom Tries to Conceal the SEC Investigation from SGC's Auditor**

117.    On or about February 22, 2006, Chadbourne received an audit letter request from SGC regarding BDO Seidman's audit of SGC's annual results for 2005. The audit letter asked Chadbourne to provide information to BDO concerning "all matters of pending or threatened litigation, claims or assessments (excluding unasserted claims)" against SGC. The letter also noted SGC's representation to BDO that "there is [sic] no unasserted possible claims that you have advised us are probable of assertion and should be disclosed in accordance with Statement of Financial Accounting Standards No. 5."

118.    In Chadbourne's audit response letter to BDO, dated February 24, 2006, Sjoblom omitted *any* reference to the SEC's investigation of SGC for possible securities fraud. Later that same day, Sjoblom wrote to Alvarado and Suarez that he received a "strange phone call" from BDO inquiring about Chadbourne's audit response letter and Chadbourne's earlier October 2005 letter to the SEC. Sjoblom informed Alvarado that he asked BDO where they obtained Chadbourne's letter to the SEC. Sjoblom also informed Alvarado that he had told BDO that the SEC matter was mostly related to "amending compliance procedures," and that it was just part of a *routine examination*.

119.    In July 2006, Sjoblom announced that he was leaving Chadbourne to join the Washington, D.C. office of Proskauer Rose. As part of his departure, Sjoblom prepared a July

26, 2006 memo for Chadbourne partner's Talbert Navia and Scott Balber regarding "Status of Stanford Financial Group Matters." The memo stated that Sjoblom had worked on two Stanford Financial matters: the SEC investigation and responses to regulatory inquiries. The memo described Sjoblom's response letter to the SEC in October 2005. Sjoblom claimed his letter "set them 'back'" such that the Commission was "reconsidering" its SIBL investigation and had referred the matter to the NASD for minor regulatory issues. He concluded the memo by stating that "[e]veryone seems to prefer the 'let sleeping dogs lie' approach."

120.    That same month, Leroy King received a letter dated July 11, 2006 from the Director of the Bank Supervision Department at the Eastern Caribbean Central Bank ("ECCB"). The ECCB letter was directed to Antigua's FSRC and concerned, *inter alia*, SIBL's affiliated relationship with the Bank of Antigua. King transmitted a copy of the letter to Stanford Financial's General Counsel, Alvarado, on July 30, 2006.

121.    On August 1, 2006, Alvarado drafted King's purported response letter from the FSRC, which was calculated to mislead the ECCB regarding SIBL's finances and prevent legitimate scrutiny by the ECCB. King faxed a draft of the response letter back to Alvarado with the following handwritten words: "Please do not bill me (laugh), Thanks a million, Lee." That same day, Alvarado sent an email to Allen Stanford, reporting that "I am attaching a copy of the letter that I have drafted for Leroy King. He is very happy with it."

### 5.    Proskauer and Sjoblom Assist the Stanford Fraud

122.    Sjoblom and his associate Jackie Perrell left Chadbourne in August 2006 to join Defendant Proskauer. On September 6, 2006, Stanford Financial formally retained Proskauer to serve as its new regulatory counsel. The client listed in Proskauer's engagement letter is "**Stanford Financial Group *and its affiliated entities*.**" The engagement letter further states

that Sjoblom's hourly rate would be *discounted* to $650/hour, but the rate would increase "***should the matter go to litigation***."

123.    On that same day, September 6, 2006, Sjoblom received a call from the SEC's Jennifer Brandt, who demanded copies of Stanford Financial's current marketing brochures and disclosure statements for SIBL CDs. Brandt informed Sjoblom that the SEC's investigation of Stanford Financial was being elevated to a formal investigation for fraud. She also informed Sjoblom that the SEC had been trying to get information about SIBL from the FSRC's Leroy King, but King was not cooperating. Sjoblom immediately notified Alvarado. He also informed Alvarado that he responded to Brandt's statements regarding the fraud investigation by stating that he had "*personally gone through all operations*" of Stanford Financial and "*there was no fraud here*."

124.    On September 11, 2006, Sjoblom's handwritten notes indicate that he participated in a teleconference with Allen Stanford. During the call, Stanford told Sjoblom that *Leroy King had informed Stanford* about several phone calls that King received from Mike Moore at the SEC, and that Moore was making wild accusations about Stanford Financial, including allegations regarding a fraudulent pyramid scheme. Stanford told Sjoblom that King had called the SEC and spoken to some staff members (among them Elizabeth Jacobs), who informed King that the SEC had been interviewing some current or former FAs for Stanford Financial. Stanford told Sjoblom that King reportedly told the SEC to put all their requests in writing. Sjoblom's notes state that "just like before it is former reps (who got fired) and not depositors who are complaining."

125.    On September 18, 2006, Sjoblom held a teleconference with several SEC staff members, including Jennifer Brandt from the Fort Worth office and Mike Moore and Elizabeth

Jacobs from the SEC's Office of International Affairs. **During the call, the SEC staff bluntly told Sjoblom that they suspected Stanford Financial was a fraud and a Ponzi scheme.** They also told Sjoblom that several former FAs from Stanford Financial had informed the SEC that they suspected investor money at SIBL was being used to underwrite Allen Stanford's real estate projects in Antigua and the Caribbean.

126.    The SEC once again asked Sjoblom if SIBL would voluntarily produce documents evidencing SIBL's investment portfolio. The SEC informed Sjoblom that it had requested these materials from the FSRC, but the FSRC told the SEC that *SIBL* had not provided its approval for the FSRC to produce the documents. Sjoblom responded that he heard "through the grapevine" that the SEC had not provided the FSRC with an *appropriate* request for such documents. Of course, Sjoblom knew that the root of this "grapevine" was Leroy King, who had provided confidential information to Allen Stanford about the FSRC's correspondence with the SEC. Sjoblom also knew that the SEC's request for SIBL documents from the FSRC would be fruitless because King would not produce them.

127.    Sjoblom told the SEC staff that the Commission had no jurisdiction over SIBL, and that it would have to "go to Antigua" to get SIBL's information directly from the FSRC. Finally, Sjoblom informed the staff that he was "well-equipped" to recognize the "hallmarks of fraud" because he spent 15 years investigating fraud for the Commission, and based upon his experience and personal visit to the bank in Antigua, Sjoblom said he found SIBL to be an "incredible institution" that was credible in all its business dealings.

128.    Sjoblom immediately called Alvarado to relay his conversation with the SEC. The next day, September 19, 2006, Sjoblom began preparing a letter to the SEC's Office of International Affairs. Sjoblom's letter reiterated that the SEC had yet to make a formal written

request to the FSRC for documents evidencing the composition of SIBL's portfolio. Instead, Sjoblom alleged, the SEC had "resorted to a telephone campaign" of wild accusations even though the FSRC had found no fraud or improprieties in SIBL's operations. Sjoblom falsely stated that the SEC's phone calls to the Antiguan regulators had placed a "severe strain on [SIBL's] relations" with the FSRC, and he chided the S E C to "not be guided" by statements from "former disgruntled" FAs.

129.    On September 25, 2006, the SEC sent a letter to the FSRC labeled "Confidential and Nonpublic." The letter formally requested records and information regarding SIBL's CD investment portfolio and attached a *list* of requested documents. The letter also stated that the SEC did not object to the FSRC providing the document *list* to SIBL, and that the SEC would be providing a copy of the *list* to SIBL's counsel (Sjoblom).  King immediately provided a copy of the letter to Stanford.

130.    On September 29, 2006, the SEC provided a copy of the document list to Sjoblom. In its cover letter, the SEC asked Sjoblom for his "client's cooperation in making [SIBL's] documents available for review." The SEC also referenced an upcoming visit to Antigua on October 11, 2006.

131.    On October 2, 2006, Sjoblom forwarded a copy of this letter to Alvarado.  In a teleconference that same day, Sjoblom and Alvarado agreed that the SEC would have to get its requested documents from the FSRC because SIBL's information is "proprietary," but maybe they could "throw them [the SEC] a few crumbs" by providing a few documents. Alvarado also forwarded the letter to Allen Stanford. Stanford replied, "No wau [sic] are they coming on Oct. 11.  We all will meet on Wed[nesday] in Miami."

**6.**     **The SEC Moves Forward with a Formal Order of Investigation**

132.     On October 10, 2006 — just one day before the SEC's scheduled visit with the FSRC in Antigua — Leroy King finally responded to the SEC's formal request for records and information concerning SIBL's CD investments. King's letter stated that the FSRC's recent examinations of SIBL had revealed no matters affecting SIBL's standing, confirmed SIBL's compliance in all areas, and concluded that there are "no other issues or matters of concern with SIBL to date." More importantly, however, King's letter also stated that the SEC and FSRC had to enter an acceptable memorandum of understanding before the SEC could visit the FSRC in Antigua.

133.     That same day, the SEC called Sjoblom and told him that the SEC still had not received any documents regarding SIBL's portfolio or investments.   The SEC demanded confirmation from SIBL that it would produce responsive documents to the FSRC. According to Sjoblom's notes from the call, the "SEC wants confirmation from us that we will produce records so that the SEC can tell the FSRC that SIBL will do so." In parentheses following this note, Sjoblom revealed his knowledge and complicity in Stanford Financial's shell-game strategy to obstruct the SEC's investigation: "*this is clearly a  ploy by the SEC to get the FSRC to produce the banking documents because SIBL says that it is ok to do so.  <u>NO</u>!!*" (emphasis added).

134.     Later that day, Sjoblom held another teleconference with the SEC. He reiterated his position that the SEC lacked jurisdiction over SIBL and that Stanford Financial was "prohibited under Antiguan law from releasing" certain bank records. Of course, when Sjoblom made this representation, he had no idea whether Antiguan law actually prevented Stanford Financial from producing SIBL's bank records.

50

135.    The SEC's Jennifer Brandt sent Sjoblom a letter confirming their teleconference. She noted that the FSRC possessed responsive documents regarding SIBL and that Sjoblom represented during the call that SIBL had no objection to the FSRC's production of such documents to the SEC. Sjoblom prepared a response letter to the SEC, and both Alvarado and Allen Stanford provided comments. Sjoblom's letter, dated October 13, 2006, informed the SEC that, *inter alia*, "it would be inappropriate for me to authorize you to have access to the FSRC's files." Then Sjoblom proceeded to strangely speak for the FSRC, stating that "[w]hile I cannot confirm what the FSRC desires from the SEC" in the form of a memorandum of understanding, "it is my understanding that the FSRC is insistent that appropriate bi-lateral government protocols and proper procedures be followed in this case."

136.    Frustrated by Sjoblom's constant shell game, the SEC issued a Formal Order of Investigation (Case No. FW-2973-A) (the "Order") on October 26, 2006. The SEC's Order alleged, *inter alia*, that Stanford Financial might be violating Section 7(d) of the Investment Company Act by selling what amounted to investment company securities (the SIBL CDs) without registering SIBL as an investment company.

137.    After receiving and reviewing the SEC's Order of investigation, Sjoblom informed Alvarado that he thought the SEC's investment company allegation was a "stretch" because "banks are exempt from the definition of investment companies[,]" but Sjoblom believed the claim raised some jurisdictional issues that could lead to a court fight. Sjoblom also noted the Order's allegations regarding SGC's failure to properly supervise employees who may have violated federal securities laws.

> The failure to supervise allegation sweeps everyone at the supervisory level within SGC, so some folks may need separate representation as we go along. For now, let's keep

everyone together as a team and under the same tent. But, we
need to watch how this shakes out.

**7.      Sjoblom Advises Stanford Financial to Violate SEC Subpoenas**

138.      Shortly after the SEC issued its Order of investigation, the SEC began issuing the

first of several subpoenas to SGC, including a November 29, 2006 subpoena seeking, *inter alia*,

all documents regarding SGC's due diligence of SIBL and SIBL's CDs, all agreements in

effect between SGC and SIBL, and all documents evidencing investments held in SIBL's

portfolio. In response to these subpoenas, Sjoblom told the SEC that SGC would begin a

"rolling" production in late December 2006 and that production would continue for a

maximum of 60 days. Sjoblom also told the SEC that he would produce various SGC

employees for testimony after the production was complete. The document production began on

December 21, 2006, with SGC's Bernard Young producing a variety of responsive documents to

the SEC.

139.      Over the next several weeks, Sjoblom worked with Stanford Financial to review

and discuss additional documents for possible production to the SEC. It was at this point that

Sjoblom pushed his shell game to new heights of obstruction. **Sjoblom advised Stanford**

**Financial to withhold (*i.e.*, *not* produce) critical documents that were clearly responsive,**

**non-privileged, and crucial to the SEC's concerns.** Some of the first files that Sjoblom told

his client to *withhold* from production were files belonging to SFIS, SIBL's representative office

in the United States. Inexplicably, Sjoblom characterized SFIS as having "nothing to do with

SGC" despite the facts that SFIS was SIBL's representative office in the U.S. and it shared

offices and *personnel* with SGC in Houston and Miami. But the most telling document that

Sjoblom ordered his client to withhold from production was SGC's investment portfolio contract

with *SIBL*.

140.    On January 23 and 24, 2007, Sjoblom traveled to Houston and met with Stanford

Financial personnel, including Lena Stinson, Bernard ("Bernie") Young and Rebecca Hamric, to

review documents and coordinate Stanford Financial's production to the SEC. During these

meetings, Young pulled a copy of a Financial Consulting and Advisory Services Agreement

("Private Equity Agreement") between SGC and SIBL, effective as of December 1, 2004.

Schedule A of the Private Equity Agreement provided a description of SGC's advisory services

for SIBL:

> SGC will provide financial consulting and advisory services to SIBL, which **will
> include management of certain holdings in SIBL's existing and future
> portfolio**. SGC will review and monitor the financial condition and business
> operations of the portfolio companies, including analysis of financial statements
> and shareholder reports, and will provide evaluations and reports to SIBL in such
> form as reasonably requested by SIBL. SGC may also perform due diligence and
> assist in negotiating terms on future investments . . . .

141.    Young showed the Private Equity Agreement to Sjoblom for his review. A copy

of the Agreement in Sjoblom's file suggests that the document had already been Bates-labeled

for production to the SEC. The Private Equity Agreement was clearly responsive to item 5 of the

SEC's November 29, 2006 subpoena, which demanded production of "all agreements in

effect between SGC and [SIBL], including any referral agreements," from January 1, 2001 to the

present.

142.    During Sjoblom's ensuing discussion with Young, Sjoblom learned that over

$230 million of SIBL's portfolio was invested in illiquid *private equity* holdings, and that

SGC *managed* these investments under its Private Equity Agreement with SIBL. This

information directly contradicted what Jim Davis and Laura Pendergest-Holt told Sjoblom on

August 10, 2005 when they stated that SIBL did *not* invest in private equity because the

investments were illiquid. Based upon Sjoblom's substantial due diligence and experience

representing Stanford Financial, he knew these private equity investments had **not** been disclosed to SIBL's CD investors, nor had SGC's management of these investments been disclosed. Sjoblom also knew that both he and Stanford Financial had repeatedly misrepresented SGC's knowledge of SIBL's investment portfolio to the SEC.

143.     Sjoblom also realized that if the Private Equity Agreement was produced to the SEC, then the Commission could finally obtain documents evidencing at least part of SIBL's investment portfolio, and possibly the *entire* portfolio. In other words, if the SEC received a copy of this Agreement in January 2007 — and thus discovered that SGC managed part of SIBL's investment portfolio — then Sjoblom knew he could no longer object to the SEC's efforts to link SGC with SIBL and potentially investigate *all* of SIBL's portfolio holdings.

144.     As a result, Sjoblom advised Young, Stinson and Hamric to **NOT** produce SGC's Private Equity Agreement with SIBL.  Instead, Young placed the Agreement in a folder marked "Do not produce."  On a copy of the Agreement in Sjoblom's file, which he marked "1/23/07," Sjoblom wrote on Schedule A's description of services that **"this shows we <u>know</u> of [SIBL's] portfolio because capital market group of SGC**," but then he scratched out the words "shows we" and wrote above "does not." (underline emphasis in original)

145.     Under the Sarbanes-Oxley Act, Sjoblom had a duty to report this matter up to his client's Chief Legal Officer, Alvarado, and from there to SGC's Board of Directors, and if unavailing, to withdraw from representing Stanford Financial altogether. He did none of that. Instead, on that same day, January 23, 2007, Sjoblom asked his associate Jonathon Hanks to send him (via email to Rebecca Hamric) a copy of a memo he had previously prepared for another client on "Obstruction of Justice."

146.     If SGC's Private Equity Agreement with SIBL had been properly produced to the

SEC, then the Commission would have confirmed its suspicions that Stanford Financial was misrepresenting SIBL's portfolio and SGC's knowledge of that portfolio. If the Agreement had been properly produced, then the SEC could have shut down Stanford Financial's operations much sooner than February 2009. Instead, Stanford Financial's Ponzi scheme continued to grow for another two years, enabling SIBL to sell roughly *$2 billion* of additional CDs.

147.    Sjoblom also told Stanford to destroy evidence and to move evidence from Houston to offshore in Antigua to evade the jurisdiction of the SEC.  Handwritten notes from Sjoblom from sometime in late 2007 or early 2008 reveal that he advised Stanford to "physically destroy" hard drives on desktop and laptop computers, as well as SIM cards from Blackberry devices, and that Stanford would need to ensure that all SIBL-related documentation further be removed from Stanford's U.S. offices and moved to Antigua.  Sjoblom's notes further reveal his directive that all "*FSRC quarterly reports or other information provided to the FSRC, such as the electronic transmission of the investment portfolio for the annual exams as done by the FSRC have to be moved to Antigua AND **ALL** FUTURE REPORTS **MUST** BE DONE AT THE BANK IN ANTIGUA*" (emphasis in original).

## 8.    Proskauer Tries to Conceal SEC Investigation from BDO Seidman

148.    During this same period, Sjoblom was also busy drafting Proskauer's response to a new audit letter request concerning BDO's annual audit of SGC for 2006. Like the prior request, SGC's letter asked Proskauer to provide information to BDO concerning "pending or threatened litigation, claims or assessments," and noted SGC's representation to BDO that "there is [sic] no unasserted possible claims that you have advised us are probable of assertion and should be disclosed in accordance with Statement of Financial Accounting Standards No. 5."

149.    When Sjoblom received this audit request, he knew that the SEC had launched a

formal fraud investigation of SGC in the summer of 2005, and that in 2006, the SEC had entered

a Formal Order of Investigation and issued several subpoenas in pursuit of that investigation.

Despite this knowledge, **Sjoblom's audit response letter, dated February 23, 2007, once**

**again failed to disclose the SEC's fraud investigation to BDO.**   In response to this

glaring omission, Sjoblom received a February 28, 2007 email from Carlos Ancira, BDO's audit

partner for SGC:

> Tom, I am the audit engagement partner of Stanford Group Company (SGC). I am aware of the SEC investigation which recently was brought to my attention by Mr. AJ Rincon and Mr. Bernerd [sic] Young. **When we sent out the legal representation letters, we were not aware of this matter.** Due to the sensitivity of the situation, the only persons knowledgeable about this matter in our audit engagement team are myself and my senior manager, Marie O'Neil.
>
> I understand the reason for your legal letter response not addressing this matter. However, I would like to have a conversation with you about this. As you know, SGC needs to file its audit report to the NASD today and I would need to speak with you before I approve release of our opinion in the audit report."

(emphasis added).   According to Sjoblom's billing records for that day, he held three separate

teleconferences with BDO regarding his false audit response letter.

### 9.   The SEC Issues Document and Testimony Subpoenas to Allen Stanford

150.   That same day — February 28, 2007 — Proskauer's Jackie Perrell informed

Sjoblom that the SEC had called her to discuss scheduling testimony from four SGC officers and

*Allen Stanford*. Sjoblom promptly called Jason Rose at the SEC and told him that Allen

Stanford was unavailable for testimony until *June 2007*. Sjoblom also pushed back the SGC

officers' testimony until May 2007.

151.   On June 5, 2007, the SEC formally subpoenaed Allen Stanford and demanded

that he produce all his SIBL-related emails by June 29 and testify in September 2007. The

SEC also issued new subpoenas to SGC's Danny Bogar, A.J. Rincon, Eddie Rollins, and Jay

Comeaux, ordering them to produce their SIBL-related emails and testify in August and September 2007.

152.    Despite the SEC's efforts to further its investigation, Sjoblom and Stanford Financial engineered delay after delay in producing the requested emails, including "unforeseen" technical problems that caused even further delays.[13] Sjoblom and Stanford Financial also continued to explore ways to withhold responsive documents from the SEC.

153.    In the meantime, Proskauer associate Jackie Perrell was also drafting a memo addressing the SEC's new allegation that Stanford Financial was violating Section 7(d) of the Investment Company Act by selling SIBL CDs without registering SIBL as an investment company. On August 13, 2007, Perrell provided her memo to Sjoblom, in which she concluded that SIBL was *exempt* from the Investment Company Act because it was a foreign bank incorporated in Antigua and was "engaged substantially in commercial banking activity." Of course, Sjoblom knew her conclusion was unfounded because he knew that SIBL was ***not*** substantially engaged in commercial banking activity, as SIBL did not make traditional loans and its sales brochures marketed SIBL as having "no credit risk" because it did not make such loans.

## 10.    Suspicious Facts and Allegations of Fraud Continue to Mount

154.    It was during this period of orchestrated delay that Sjoblom uncovered even more suspicious activities and fraud allegations at Stanford Financial. On August 13 through 17, 2007, during another week of meetings at SGC's offices in Houston, Sjoblom and Perrell discovered that SGC had *ignored* Sjoblom's advice and continued its sales contests for SIBL CDs. One contest allowed SGC's FAs to earn additional bonuses — *above* the extraordinary 3%

---

[13] When Sjoblom responded to the SEC's first subpoenas, he told them that SGC would begin a "rolling" document production in December 2006 that would continue for a maximum of 60 days, and that he would produce various SGC employees for testimony once the production was complete.

referral fee — if they met certain sales thresholds, including a "mega (super) bonus of an additional $125,000 if they reach[ed] $25 million in one quarter from one client." Sjoblom and Perrell also learned that Stanford Financial circulated a weekly "scorecard" for the contest, called the "Hustle Sheet," which listed CD sales quotas, goals, and results for various sales teams, including the "SGC Superstars." The Hustle Sheet made it clear that SIBL CDs were the **only** product marketed and sold by the SFIS offices in Miami, Houston and San Antonio. During these meetings with SGC, Sjoblom also learned that SGC regularly conducted CD sales seminars to market SIBL CDs to investors, a practice that cast serious doubts on whether Stanford Financial was generally soliciting investors in violation of SIBL's Reg. D exemption.

155.   Sjoblom also discovered that Stanford Financial's list of "disgruntled" former employees alleging fraud was growing, and now included Charles Hazlett, Mark Grensch and Ron Rossi.[14]   Sjoblom also learned that SIBL's grossly inadequate private insurance, which purportedly "protected" depositors from loss, now amounted to less than $100 million, *or less than 2%*, of SIBL's total outstanding CD liabilities.   Finally, Sjoblom discovered that a Stanford Financial employee in Mexico had been "intercepted" by Mexican authorities for illegally taking checks out of Mexico for investments in SIBL CDs.   Despite these revelations, Sjoblom continued to represent Stanford Financial and failed to report up the chain or withdraw as counsel as required under the Sarbanes-Oxley Act.

## 11.   Proskauer Lies to BDO Seidman Again

156.   On February 8, 2008, Sjoblom received an audit request letter from Glen Rigby, Stanford Financial's Assistant General Counsel, concerning BDO's annual audit of SGC for 2007. In an email dated February 14, 2008, Sjoblom instructed Perrell to prepare Proskauer's

---

[14] Charles Satterfield, another former employee who was terminated by SGC, alleged in a 2007 FINRA arbitration proceeding that Stanford Financial executives held the SEC in "utter contempt," refused to file required documents, hid information from the SEC, and destroyed files.

response, and told her not to discuss the content of Proskauer's response with BDO. The letter, dated February 14, 2008 and signed by Proskauer partner Richard Rowe, purposefully omitted any discussion of the SEC's formal fraud investigation.

## 12.    Former SGC Financial Advisors Allege that SGC Destroyed Documents

157.    On July 3, 2008, Bloomberg published a damning article regarding the SEC's investigation of SGC and the SIBL CD program. The next day, Sjoblom emailed Jacqueline Perrell about Bloomberg's report, "Bad News – the news story could not have been worse." That same month, the SEC subpoenaed former SGC FAs Charlie Rawl and Mark Tidwell, who had previously filed a lawsuit alleging that SGC purged files and destroyed documents related to the SEC investigation.[15] When Alvarado informed Sjoblom of this matter, Sjoblom immediately recognized that he interviewed Tidwell in June 2005 during his initial due diligence on Stanford Financial. Sjoblom advised Alvarado that Tidwell was "bound by confidentiality," and that Stanford Financial could use this information against him in a motio to dismiss.

## 13.    FINRA and the Federal Reserve Board Pursue Their Own Investigations

158.    On August 29, 2008, FINRA (formerly the NASD) sent a letter to SGC regarding its January 2008 responses to FINRA's requests for information about SIBL. The  letter informed SGC that its responses to FINRA's requests were incomplete "given the direct affiliation between SIBL and SGC as well as both entities' common ownership." FINRA reiterated its demands for information regarding SIBL's asset portfolio and a list of asset

---

[15] As alleged in their lawsuit, SGC adopted new policies in response to the ongoing SEC investigation, including ordering the removal or destruction of information contained in client or company files and purging electronic data from computers. Rawl and Tidwell allegedly became concerned when, in the summer of 2006, all the assistants for Stanford Financial's FAs were told to remove any information from their client files that wasn't on SGC letterhead, including notes and interoffice email, just before an SEC inspection. Then in March 2007, Rawl and Tidwell were called into a meeting with management, in which they were told to stop enumerating their concerns about SIBL in intercompany emails because the emails could fall into the hands of the SEC. Rawl and Tidwell were terminated by SGC before they could resign, and were then sued by SGC, which was Stanford Financial's common practice for anyone who questioned what was really going on.

managers.

159.    With the help of Alvarado and Rebecca Hamric, Bernie Young responded on behalf of SGC in a letter dated September 24, 2008. Young's letter provided copies of some additional SIBL due diligence materials but informed FINRA that SGC stood by its original responses:

> . . . SGC does not have access to SIBL's books and records. This includes SIBL's investment portfolio statements, position reports and other documents that would identify and detail all holdings, assets, and allocations of the investment portfolios underlying the SIB CDs that you have requested from SGC.  SGC has produced to you everything in its possession relating to investments in SIBL's portfolio . . . .

To support SGC's position, Hamric prepared a legal memo concluding that SGC could not be required to produce SIBL documents just because both companies were ultimately owned by the same person, Allen Stanford.

160.    Meanwhile, the Federal Reserve Board ("Federal Reserve") had opened its own investigation to determine whether SIBL was using SFIS to operate unregistered bank representative offices in Miami, Houston and San Antonio. On September 26, 2008, the Federal Reserve served a subpoena on the Miami office of SFIS and requested documents relating to, *inter alia*, the relationship between SFIS and Stanford Trust Company Ltd (Antigua) ("STCL"), as well as documents concerning SFIS's marketing and sales of SIBL CDs, and all communications related to SIBL CDs between SFIS and other Stanford Financial-related entities. The Federal Reserve also issued similar subpoenas to Allen Stanford and Stanford Trust Company (STC) in Baton Rouge, Louisiana.

161.    On September 30, 2008, Sjoblom held a teleconference with Alvarado about the Federal Reserve's subpoenas. In typical fashion, Alvarado asked Sjoblom whether Proskauer

"knew anyone" at the Federal Reserve, and asked whether the Federal Reserve even had jurisdiction over SFIS. The next day, October 1, 2008, Sjoblom called Federal Reserve lawyer Lisa Villareal to question the basis for its jurisdiction. Villareal told Sjoblom that the Federal Reserve was investigating whether SFIS was actually operating as an unregistered branch office of SIBL in the United States, and that it had jurisdiction over this matter under the International Banking Act, 12 U.S.C. § 3101, and Regulation K. Villareal also told Sjoblom that the Federal Reserve was concerned that SFIS had strayed way beyond its authorization from the State of Florida. Additionally, regardless of that authorization, the Federal Reserve had never given *its* approval for SFIS to act as SIBL's representative office in the U.S.

162. Sjoblom asked Perrell to research whether the Federal Reserve had jurisdiction over SFIS and STC. In a memo dated October 1, 2008, Perrell concluded that the Federal Reserve did in fact have jurisdiction over these entities because they were affiliated with SIBL. Moreover, Perrell concluded that SFIS was in fact acting as SIBL's representative office in the U.S. **But then Sjoblom changed her memo.** In the draft copy that Sjoblom sent to Alvarado the next day, Sjoblom argued that SFIS was not subject to the Federal Reserve's jurisdiction because it was technically a representative office for STCL, *not* SIBL. Of course, Sjoblom knew that SFIS's only function was to market and sell SIBL's CDs in the United States. Sjoblom also advised Alvarado that STC could quash the Federal Reserve subpoena because STC was not performing any banking functions.

163. On October 15, 2008, Sjoblom, Perrell, Alvarado and Stinson met with the Federal Reserve. During that meeting, Sjoblom falsely represented to the Federal Reserve that Allen Stanford was *not* involved in Stanford Financial's day-to-day operations, and he offered to submit Allen Stanford's verified statement to that effect. Sjoblom also convinced the Federal

Reserve that Stanford Financial needed more time to produce the voluminous records requested in the subpoena. The Federal Reserve allowed Stanford Financial to begin its document production on November 17, 2008 and continue producing documents on a rolling basis through February 2009.

164.    On October 19, 2008, Perrell prepared a legal memo for Sjoblom that addressed the remedies available to the Federal Reserve if SFIS qualified as SIBL's unregistered bank representative office in the United States.  Perrell's memo concluded that SFIS could be liable for civil damages up to $25,000 per day, and its principals could face possible prison time for up to five years and fines up to $1 million per day.

165.    On October 30, 2008, Perrell prepared another legal memo to address the types of activities that comprised "core" banking functions versus "back office" functions. Perrell's memo concluded that virtually all of SIBL's back office functions, including legal, human resources, information technology, and accounting, were being performed by Stanford Financial Group Company in Houston. Of course, Sjoblom had known this since 2005.

166.    On December 16, 2008, the Federal Reserve sent a letter to Sjoblom stating that Stanford Financial's document production was deficient. According to the letter, Stanford Financial had produced documents from its U.S. offices only, and had failed to produce documents from SIBL, despite the Federal Reserve's subpoena to SIBL's Chairman, Allen Stanford. The Federal Reserve's letter demanded that Stanford Financial produce SIBL's documents.

167.    Sjoblom immediately informed Alvarado of the letter and started preparing his response. During the drafting process, Sjoblom exchanged heated words with Hamric about how to describe Allen Stanford's involvement in operations. The original draft of Sjoblom's letter

stated that Allen Stanford "delegates all operations of [Stanford Financial] to other executives." This language was revised to state that he "receives reports from independent operating companies, but not [sic] responsible for day-to-day operations of those independent operating companies." In the next draft, the language changed again to state that Allen Stanford was "*[u]ltimately responsible for overall operations*, but does not intervene on [sic] the day-to-day operations that are delegated to other employees." (emphasis added)

168.    In a December 19, 2008 email thread between Sjoblom, Perrell, Alvarado, Hamric and Stinson, Perrell informed Alvarado that Sjoblom was "uncomfortable" stating that Allen Stanford "oversees" operations because the language was "[t]oo synonymous with monitoring or responsib[ility]."   In other words, Sjoblom was uncomfortable suggesting that Allen Stanford played any meaningful role in operations, despite the fact that Sjoblom knew very well that Allen Stanford was substantially involved in operations.  Hamric responded,

> The request was for 'job responsibilities.' There is no one else listed as an officer with overall responsibility. It will look like no one is in charge. The only other 2 people listed are [Jim Davis], as CFO, [Linda Wingfield] as SVP, and [Patricia Maldonado], as Asst. Secretary. We are dealing with semantics here. Someone has to have overall responsibility.

Sjoblom quickly retorted,

> **No, we are not dealing with just semantics. We are dealing with critical legal distinctions, as well as factual ones, that have broad implications, and not just on issues of culpability but on issues of jurisdiction.**

169.    Sjoblom revised the language to state that Allen Stanford was a "[b]oard member and from time to time, receives and reviews reports from *independent* financial service companies; but, [sic] not responsible for day-to-day operations of those independent companies." (emphasis added) When Hamric questioned this language, Proskauer's Jackie Perrell supported the change,

> We would prefer the language proposed by Tom [Sjoblom] because . . . (ii) we are working through some 'affiliate' and 'control' issues and therefore we do not want any statement out there saying that Mr. Stanford is 'responsible' from a legal standpoint or otherwise in control of all these entities.

In the final draft of Sjoblom's letter, which was sent to the Federal Reserve on December 23, 2008, Sjoblom asserted that the Federal Reserve lacked jurisdiction and therefore could not demand SIBL's documents.

170.    On that same day, December 23, 2008, Sjoblom held a teleconference with the SEC as markets were reeling in the wake of Bernie Madoff's Ponzi scheme. Sjoblom told SEC attorney Kevin Edmundson that "this was not Madoff – this is a real bank, real investments with global portfolio managers, and real assets." Sjoblom's representations to the SEC are nothing short of shocking because he knew his client was committing securities fraud and lying to the Commission, and he had seen a mountain of evidence indicating that his client *was* in fact running a Ponzi scheme.

## 14.    Sjoblom Learns the Full Extent of SIBL's Real Estate and Private Equity

171.    According to Jim Davis's plea agreement, Sjoblom was informed in early January 2009 that SIBL's Tier 3 investment portfolio included both private equity and *real estate*. More importantly, Sjoblom learned that this Third Tier of real estate and private equity investments — which Stanford Financial had *never* disclosed to CD investors nor the SEC — **constituted roughly *80%* of the entire reported value of SIBL's investment portfolio, or approximately *$6 billion*.** According to the plea agreement, Sjoblom knew and understood from his prior review of SIBL's disclosures that these investments had not been disclosed. Again, however, Sjoblom did not report up the chain nor withdraw as required under the Sarbanes-Oxley Act.

**15.**   **The SEC Requests Testimony Regarding SIBL's Investments**

172.   On January 7, Sjoblom emailed Alvarado to relay his conversation with the SEC's Kevin Edmundson. According to Sjoblom, the SEC's main concern related to the CDs' extraordinarily high returns. "[H]ow can it be that the CDs are offered at such great rates?" Sjoblom wrote that Edmundson raised two issues: (i) is the SIBL CD a "security"; and (ii) "are the stated rates of return possible"?  Sjoblom continued,

> Kevin [Edmundson] stated that a recent brochure states that Stanford returns were 3.9% better than other US bank CDs . . . there is some concern that this case not be another Madoff-type case.

> . . . Kevin [Edmundson] asked whether I would present a witness that will tell the SEC what is going on and what the allocations are? And, where the money is invested?

Sjoblom discussed these issues with Alvarado later that day. According to Sjoblom's notes, Alvarado told him that Stanford Financial's immediate objective for the SEC investigation was to "gain time" because "any publicity could kill us."

**16.**   **Sjoblom Discovers More Incriminating Facts About SFIS and SIBL**

173.   During this same period, Sjoblom was continuing to defend SFIS in the Federal Reserve investigation. On January 8, 2009, Sjoblom held a teleconference with Stanford Financial's Lena Stinson, in which he discovered that for many years SIBL had issued bank credit cards to clients referred by SFIS, and had consistently issued those credit cards to SFIS in Miami, Houston or San Antonio. Sjoblom also learned that SFIS regularly instructed SIBL to pay SIBL customers' bills from their SIBL accounts. This information left little doubt that SFIS was acting as SIBL's representative office in the U.S. Meanwhile, Proskauer's Jackie Perrell continued drafting her legal memo regarding the Federal Reserve's jurisdiction. Perrell's memo confirmed her prior conclusion that the Federal Reserve likely had jurisdiction over SFIS as an

affiliate of SIBL, and that it possibly had jurisdiction over *SIBL* as well.

**17.      FINRA Raids SGC's Offices Across the United States**

174.     On January 12, 2009, FINRA examiners raided several SGC offices, including Miami, Tupelo, Dallas, Memphis, Baton Rouge, Charlotte and New Orleans. FINRA's examiners demanded access to  SGC's computers and documents and began interviewing SGC employees. When several SGC  branch managers refused to cooperate, the examiners threatened to revoke their securities  licenses. FINRA launched the raids to search for information concerning the SIBL CD program.  In the Memphis office, FINRA's examiners successfully seized a computer hard drive that possibly contained ***all*** of SIBL's portfolio information.

175.     According to Sjoblom's notes, Alvarado called him in "a panic." The next day, January 13, 2009, Sjoblom exchanged emails with FINRA's Andy Favret about the hard drives seized from SGC's offices in Memphis and Tupelo. Sjoblom objected to the "forced production" and "strong arm tactics" employed during FINRA's raids, which he later characterized as a "blitzkrieg" raid. Later that day, FINRA sent a letter directly to SGC's Bernie Young and Danny Bogar, noting SGC's "continued failure to provide access" to the remaining computer records in its Memphis office. FINRA also noted that SGC's "outside counsel" (Sjoblom) had informed FINRA that SGC would ***not*** provide access to these computer records. FINRA stated that all negotiations were over.  FINRA demanded that *all* of SGC's computer records in Memphis be made available, or FINRA would take disciplinary action against SGC and the individuals involved.

176.     On January 14, 2009, Sjoblom interviewed Memphis analysts Mark Collinsworth, John Adams, and Wade McGee. Each analyst confirmed that SIBL's investment  portfolio

included private equity and real estate holdings. That same day, the SEC issued document and testimony subpoenas to Jim Davis and Laura Pendergest-Holt, requiring them to produce documents by January 26 and provide testimony on January 29 and 30, 2009.

177. The next day, January 15, 2009, Sjoblom interviewed Bernie Young, Stanford Financial's Chief Compliance Director, and for the very first time Sjoblom grilled his client about SIBL's auditor, Hewlett & Co. Sjoblom asked Young how SGC was comfortable with Hewlett & Co. as SIBL's auditor. Young told Sjoblom that he merely looked up Hewlett & Co. on the Internet and talked to people at SIBL. That was it. Sjoblom asked Young about the size of Hewlett & Co.'s firm, the number of people from the firm who were involved in SIBL's annual audits, and whether the firm had any other clients. **Young did not know the answers.**

**18.     Opinion Letter Confirms that SIBL is an "Investment Company"**

178. On January 16, 2009, Sjoblom emailed Young and asked him to "call me ASAP BEFORE next interview." (emphasis in original) Sjoblom also emailed Alvarado and said he wanted to "shut down the breadth of the SEC exam interrogations." He asked Alvarado to send him a copy of Stanford Financial's prior opinion letter concerning its compliance with the Investment Company Act. Of course, Jackie Perrell had already researched this issue and concluded that SIBL was exempt from registration under the Act because it was a foreign commercial bank that supposedly issued loans. But Sjoblom knew her conclusion was wrong because his own due diligence in 2005 showed that SIBL was a private *investment* bank that did *not* make traditional loans, and SIBL's sales brochures marketed the bank as having "no credit risk" because it did not hold such loans.

179. The following day, January 17, 2009, Young advised Sjoblom that he sent the "due diligence file" to Sjoblom's house. Two days later, Alvarado's secretary emailed Sjoblom

a copy of Stanford Financial's prior opinion letter on the Investment Company Act. The November 11, 1998 letter from Greenberg Traurig LLP opined that Stanford Financial would be exempt from registration under the Investment Company Act if it is "engaged substantially in commercial banking activity," which can be satisfied if "it derives a substantial amount of its business from accepting demand and other deposits, and . . . extending commercial and other types of credit." The letter also stated that Stanford Financial should be exempt because "[it] is not primarily engaged in the business of investing in, holding, or trading securities . . . ."

180.    When Sjoblom reviewed this letter, he knew that *neither* of these exemptions applied. Based upon his substantial due diligence and experience representing Stanford Financial, Sjoblom knew that (i) SIBL was not a commercial bank because it did not "derive[] a substantial amount of its business" by issuing loans, and (ii) SIBL operated more like a "classic" investment bank that "primarily engaged in the business of investing in, holding, or trading securities."  Sjoblom knew that SIBL was an investment company and had to be registered under the Act.

### 19.    Sjoblom Explicitly Agrees to Offer False Testimony to the SEC

181.    On January 21, 2009, the SEC issued a subpoena to Allen Stanford, demanding that he testify before the Commission on February 6, 2009. That same day, Sjoblom met with Davis, Pendergest-Holt, Alvarado, Stanford (by phone) and others at Stanford Financial's airplane hangar in Miami to discuss the SEC investigation and determine who should testify. When Sjoblom attended this meeting, he understood that the SEC subpoenas would require Stanford, Davis, and Pendergest-Holt to make a complete and transparent presentation to the Commission, *under oath*, regarding all investments in SIBL's CD program, including Tier 3

assets.  Even though they knew that Stanford and Davis had the most knowledge about the assets

in SIBL' Third Tier portfolio – which purportedly contained approximately *$6 billion* of

undisclosed real estate and private equity investments – Stanford, Davis, Pendergest-Holt, and

Sjoblom all agreed in this meeting that Sjoblom would try to convince the SEC that Stanford and

Davis did not know *anything* about SIBL's assets, and that Pendergest-Holt and another SIBL

executive, President Juan Rodriguez-Tolentino, could provide the best testimony and evidence to

the SEC regarding SIBL's *entire* investment portfolio.   They also agreed to meet in Miami

during the week of February 2, 2009 to bring Pendergest-Holt and Rodriguez-Tolentino "up to

speed on Tier 3" before their testimony to the SEC.

182.     The next day, January 22, 2009, Sjoblom met with several SEC attorneys at a

restaurant in Houston, Texas to discuss the SEC's investigation. The SEC attorneys reiterated

that the purpose of their investigation was to determine how SIBL's entire portfolio of assets

were invested, and where they were managed, and that in order to do so, the SEC needed to

depose the Stanford Financial executives with the most knowledge of SIBL's "entire investment

portfolio." At this meeting, Sjoblom *falsely* represented to the SEC that Stanford and Davis did

not "micro-manage" SIBL's portfolio, and that Pendergest-Holt and Rodriguez-Tolentino were

the "better people to explain the details" about SIBL's *entire* portfolio. Sjoblom also

represented to the SEC that SIBL was "not a criminal enterprise" and that "all assets are there."

183.     The next day, January 23, 2009, Sjoblom met again with an SEC attorney at

Stanford Financial's offices in Houston. Sjoblom asked the attorney to defer the SEC's

subpoenas to Stanford and Davis. Once again, Sjoblom *lied to the* SEC by stating that

Pendergest-Holt and Rodriguez-Tolentino would be better witnesses than Stanford and Davis,

whom Sjoblom claimed were executive-level officers who were not involved in the "nuts and

bolts" of operations, and therefore could not testify about the details of SIBL's assets. As a result

of Sjoblom's false and misleading statements, the SEC attorneys agreed to postpone the

testimony of Stanford and Davis, and instead agreed to obtain testimony from Pendergest-Holt

and Rodriguez-Tolentino on February 9 and 10, 2009, respectively.

> 184.    On January 24, 2009, Sjoblom sent an email to Alvarado, which stated,

> > We can fully anticipate that the SEC <u>will</u> want [Rodriguez-Tolentino] to testify under oath that the bank is 'real,' the CDs are 'real,' ***that the money is actually invested as described in our documents***, and that client funds in the CDs are safe and secure. The [SEC] staff will want to be protected against obstruction and perjury . . . [Rodriguez-Tolentino] will have to be fully and carefully prepared so that he can provide details as best as humanly possible.

(emphasis in original) Sjoblom's email also stated that Pendergest-Holt would have to explain

her management and supervision of the bank portfolio to the SEC, and that because she knew

"little about Tier 3," she would "have to get up to speed on Tier 3" before her deposition.

Sjoblom said he wanted to make sure Rodriguez-Tolentino and Pendergest-Holt had enough time

to "prepare and practice" the week before the SEC meeting.  Finally, Sjoblom closed his email to

Alvarado,

> > [T]o put quite simply, this is our chance – our chance to demonstrate to the SEC that we are 'for real' and who we say we are. *I have said all of the great things I can about the company*, about Allen [Stanford], Jim Davis, Juan [Rodriguez-Tolentino] and Laura [Pendergest-Holt]. *Now is the time for us to come forward with 'positive evidence' of everything I have been saying to [the SEC] for the last 3 years.*

(emphasis added).

## 20.    Sjoblom Prepares Rodriguez-Tolentino and Pendergest-Holt for Testimony

> 185.    On January 26, 2009, Sjoblom emailed a 95-page outline to Juan Rodriguez-

Tolentino entitled "SEC Presentation."   The outline, which Sjoblom drafted in **<u>2005</u>**, was

intended to address the SEC's fraud allegations by providing a detailed summary of Stanford Financial's operations and regulatory environment.  Sjoblom's outline also stated that SIBL's investment portfolio was "made up of equities, bonds, treasury debt, fiduciary placements, currencies, and metals." But Sjoblom knew this information was false because it did not disclose the approximately $6 billion in real estate ventures and private equity holdings that comprised roughly 80% of the bank's total investments.

186.    On January 27, 2009, Sjoblom emailed Pendergest-Holt and Rodriguez-Tolentino, with a copy to Davis, regarding the need to address all three Tiers of SIBL's asset portfolio, and to "[p]rovide 'positive proof' that investor funds are invested as and where we say they are." Sjoblom also noted the need to alleviate the SEC's concerns that "Allen [Stanford] 'owns' [the FSRC] . . . [,]" and SIBL's ability to "continue to pay such high rates of return[.]" Sjoblom closed his email by challenging Pendergest-Holt and Rodriguez-Tolentino:

> Tidwell and others have 'thrown down the gauntlet,' so we need to rise to the occasion. I know we can and must. **Our livelihood depends on it.**

(emphasis added).

187.    On January 28, 2009, Jackie Perrell emailed Sjoblom the relevant sections of Antigua's International Business Corporations Act (the "IBC Act"). Perrell followed up with an email to Sjoblom later that day, "***I do not see anything [in the IBC Act] that expressly prohibits FSRC from disclosing the information*** . . . ." Less than an hour later, Sjoblom wrote to Juan Rodriguez-Tolentino that he had studied the Antiguan law and found ***nothing*** in that law which provided confidential protection to the composition of SIBL's investment portfolio, and nothing that would prohibit Stanford Financial or the FSRC from disclosing this information to the SEC.

188.    The next day, January 29, 2009, Sjoblom emailed Lena Stinson to request a copy of SIBL's opinion letter from its Caribbean counsel, Erroll Cort, "with an interpretation under

the IBC Act that information regarding SIBL's assets . . . is confidential." (emphasis in original) Sjoblom said he needed the opinion to prepare his response "to a pending request from the SEC staff." But Stinson responded that she had only spoken to Stanford Financial's "*internal Caribbean* [General Counsel] . . . ." (emphasis added) She then suggested that Sjoblom could find the answer in the FSRC's *internal rules*, which purportedly required the FSRC to maintain the confidentiality of "information specific to [its] exam and findings," which "cover the portfolio holdings." She added that Rodriguez-Tolentino could provide "better information."

189.    Instead, Sjoblom drafted a letter to the SEC in which he continued to argue that Antiguan law prohibited SIBL from disclosing its portfolio information "without the express authorization of the FSRC." That same day, January 29, Sjoblom sent a draft of his letter to Alvarado,

> Mauricio [Alvarado], this is the best argument I can make, but it may be a stretch, and we should have an opinion of Antiguan counsel to *verify its accuracy*, since I am not licensed to interpret Antiguan regulations.

(emphasis added).

190.    The next day, January 30, 2009, Sjoblom emailed Alvarado an updated draft of his letter to the SEC. Sjoblom asked Alvarado to focus on the paragraph discussing Antiguan privacy laws, advising him that "[w]e need an opinion of . . . outside counsel to the bank[] to support it." Sjoblom never received that opinion.

191.    On February 2, 2009 — after years of lying to the SEC, withholding documents, and generally helping his client obstruct the SEC's investigation — Sjoblom finally became nervous.  He asked Perrell to review the Sarbanes-Oxley Act and determine a lawyer's duties when he suspects his client is engaged in securities fraud.  Perrell sent him  Section 307 of the Act, which requires a lawyer to "report up" the fraud to his client's Chief Legal Officer or Chief

Executive Officer, and if that is unsuccessful, to report up to the Board of Directors and/or resign.

192.     Instead of complying with the Act, however, Sjoblom kept going. In fact, on February 3, 2009, Sjoblom signed and forwarded the final draft of his response letter to the SEC's Kevin Edmundson.  Sjoblom's letter continued to argue that Antiguan privacy laws prohibited SIBL from disclosing its investment information, even though Sjoblom was unable to confirm the veracity of this argument and never received an independent opinion from licensed Antiguan counsel.

**21.     Allen Stanford Meets with Sjoblom and Personally Admits the Fraud**

193.     On February 3, 2009, Sjoblom met with Pendergest-Holt, Rodriguez-Tolentino, Davis, Alvarado and others at Stanford Financial's Miami offices for four days of meetings to prepare for SEC testimony. During their initial meetings, Pendergest-Holt reported that the assets she managed in Tier 2 had fallen to only $350 million, down roughly ***$500 million*** from June 2008.

194.     That same day, Sjoblom met with Alvarado.  According to Sjoblom's notes, he warned Alvarado that they were treading on thin ice,

> [I]t [is] now Wednesday (two days into the meeting) and we still don't know what is going on with [T]ier 3. We discussed the need for Allen [Stanford] and Jim [Davis] to come clean. Mauricio [Alvarado] said that he was an ethical lawyer, with integrity and highly respected in his office. He would not be involved in anything that was improper or illegal.

195.     The next day, February 5, 2009, Davis presented a pie chart reflecting the assets in SIBL's Tier 3 portfolio. According to Sjoblom's notes, "[Rodriguez-Tolentino] . . . said this was the first he had ever *heard* of [Tier 3]."  (emphasis added)  During the ensuing presentation, Davis revealed that SIBL's Tier 3 assets were comprised of: (i) real estate valued at more than $3

billion, which SIBL had purportedly acquired earlier that year for less than *$90 million;* (ii) at least $1.8 billion in "loans" to Allen Stanford; and (iii) other private equity investments totaling $1.2 billion.  Davis explained SIBL's real estate purchases to the group and "sketched out" how "Mauricio [Alvarado] and Allen [Stanford] were in . . . 'deal mode'" to purchase properties. Sjoblom asked whether Stanford Financial had used "straw men" to complete the deals and wanted to know whether SIBL had fairness opinions for the assets.

196.    Sjoblom's notes from this meeting reveal his knowledge that SIBL's real estate assets had never been disclosed to investors nor regulators: "Real estate – not disclosed in bank's financial statement and not disclosed to FSRC." His notes reveal the same problem for SIBL's purported loans to Allen Stanford: "Notes receivable – related party transactions that are not disclosed in bank's financial statements and not disclosed in quarterly report to FSRC in Antigua."

197.    When Davis told the group that SIBL still had "plenty of assets" to cover its CD obligations and that SIBL's auditors were preparing a consolidated balance sheet, Sjoblom advised Davis that "consolidated reporting . . . did not change the fact that the bank's balance sheet was false and being used to sell the CDs."  Sjoblom informed the group that SIBL's disclosures contained several false or misleading statements and that Stanford Financial could not continue to use SIBL's annual report or marketing materials.

198.    Shortly thereafter, Allen Stanford arrived at the meeting and told the group that SIBL still had "at least $850 million more in assets than liabilities." Stanford said he could raise another $1 billion if he could just have 30 more days but he could not get the funds if they stopped selling CDs.  According to Sjoblom's notes, "[Stanford] says that he needs to keep the business going.  Otherwise, all the depositors get hurt."

199.     On the morning of February 6, during Sjoblom's last day of meetings in Miami with Stanford, Davis, Alvarado, Stinson, Pendergest-Holt, and Rodriguez-Tolentino, SGC President Danny Bogar broke down crying and said "the party is over." Rodriguez-Tolentino said he would *not* testify to the SEC, and both he and Bogar said they would have to report these revelations to the SEC. When Sjoblom asked about the information in SIBL's quarterly reports to the FSRC, Davis said the reports had been falsified to omit SIBL's related-party notes receivable from Allen Stanford and its real estate investments.

200.     At this point, Stanford ordered a short break in the meeting and everyone left the room except for Stanford, Davis, and Sjoblom. His ensuing discussion with Stanford and Davis revealed that there was an even "larger problem" for the group: SIBL was insolvent and its $1 billion in capital was "underwater" by $800 million. When everyone returned and the meeting resumed, however, Stanford told the group that SIBL had "ample assets to cover CD deposit liabilities." Before the meeting closed, Sjoblom reminded the group that SIBL's balance sheet was falsely stated.  Later that afternoon, in a private conference between Sjoblom,  Stanford, and Davis,  Stanford  admitted  to  Sjoblom  that  SIBL's  assets  were overstated in its financial statements and the bank's assets and financial health had been misrepresented to investors.

201.     In a meeting that evening, Sjoblom advised Bogar and Stinson that the company may need to start an internal investigation, possibly self report its violations to the SEC, and consider a change in management. Sjoblom told them he would meet with Allen Stanford the next morning and would know more information tomorrow.

202.     Early in the morning of February 7, 2009, Sjoblom met with Allen Stanford and Juan  Rodriguez-Tolentino  in  the  lobby  of  Miami's  Intercontinental  Hotel.   During their discussions, Stanford was adamant that Stanford Financial's total assets were greater than

SIBL's deposit liabilities, and he discussed how Stanford Financial could consolidate all of its assets under SIBL Holdings, which owned the bank. According to Sjoblom's notes, "[T]his is allowed [because] Allen [Stanford] owns all companies!" (emphasis in original) Sjoblom and Stanford also discussed how SIBL could restate its earnings, which would create a "huge negative" of hundreds of millions of dollars.

203.    During the meeting, Sjoblom and Stanford also agreed that Pendergest-Holt would "stay the course" and make her presentation to the SEC as planned.   Stanford wanted Rodriguez-Tentino to continue with his presentation as well but Sjoblom warned against this approach because Rodriguez-Tentino could no longer represent SIBL "as being sound" nor could he explain the Tier 3 assets given yesterday's revelations about SIBL's financial statements.   Later that day, Sjoblom instructed Pendergest-Holt to "study you [sic] presentation."

## 22.    Sjoblom Prepares Pendergest-Holt for False Testimony to the SEC

On February 9, 2009, Sjoblom reviewed Pendergest-Holt's presentation to the SEC and emailed Alvarado about several troubling issues,

> Her slides can be interpreted as misleading on many items – both in general and to the extent the Strategic Investment Committee and [Stanford Investment Model] also apply to [T]ier [sic] 3 investments. For example, since returns on [T]ier 2 for 2008 are large negatives, how does she justify payment of stated ROI on CDs? Answer: [T]ier 3. . . . I am considering not using her slides or only a few. But, she will need to address location and portfolios of each money manager.

Sjoblom reminded Alvarado that she would be asked "lots of questions" about SIBL, marketing materials, players, and a little about Tier 3 assets. A few hours later, Alvarado responded with frustration,

> I do not understand why you did not raise those issues during [Pendergest-Holt's] rehearsal presentation last week. In any event, her presentation needs to be complete, accurate, and correct. Thus, you need to postpone her appearance before the SEC.

76

Alvarado followed up in a second email, "You are the expert please get it done." Later that night, an equally frustrated Sjoblom finally replied,

> . . . [Pendergest-Holt's] presentation was discussed briefly last Tuesday or Wednesday. She was asked by everyone in the room to cut some things and add others. We saw bits and pieces. She never had a completed product when she left to return home last Friday night. You also know that Thursday and Friday were taken up and consumed with other issues important to Allen [Stanford] and Jim [Davis]. This evening we were still adding and deleting to [sic] her presentation.

204.    Sjoblom's email exchanges with Alvarado continued through the next day until literally 30 minutes before Pendergest-Holt began her presentation and testimony to the SEC.

## 23.    Sjoblom Knowingly Presents False Testimony to the SEC

205.    On the morning of February 10, 2009, Pendergest-Holt gave a two-hour presentation about Stanford Financial to the SEC at the Commission's offices in Fort Worth, Texas. In the afternoon, she testified *under oath* before the SEC as an executive of Stanford Financial. During that testimony, where she was represented by Sjoblom as counsel for Stanford Financial, Pendergest-Holt committed perjury over and over again while Sjoblom just sat there, clearly aware of his client's outright lies to the SEC. In fact, Sjoblom actively suborned Pendergest-Holt's perjury. When she answered a direct question about whom she had met to prepare for her testimony, Pendergest-Holt said she had only met with Sjoblom. When the SEC lawyers pressed her to confirm whether anyone else attended those meetings, Sjoblom interrupted Pendergest-Holt when she started to answer the question, and he intentionally steered her to answer "no" by improperly narrowing the question to "when we were preparing *last night*, was there a third person present?," to which she answered "no." See SEC Testimony of Laura Pendergest-Holt, February 10, 2009, at 13:7-14:15. In addition to withholding information regarding her meetings in Miami the prior week and the participants at those meetings,

Pendergest-Holt falsely testified that she was **unaware** of the assets and allocations in Tier 3 of SIBL's purported portfolio, including the existence of billions of dollars in real estate and private equity holdings, and at least $1.8 billion in personal "loans" to Allen Stanford.

206.   Shortly after Pendergest-Holt's perjured testimony to the SEC, Sjoblom received a cryptic email from Jim Davis,

> thk victory. U said yourself, God is in this. RAS' salvation. Preservation of God's glory. Victory for thousands. Your vision of the school. Thk out of the box here. We can do it with u and with Stanford. There is something huge here Tom fir God. Let's build and push fwd-not pull back.  Thks for who u r.

(errors and acronyms in original).

### 24.   Sjoblom Withdraws and Disavows All Prior Representations

207.   On February 12, 2009, Sjoblom advised Alvarado that Proskauer had withdrawn as counsel to Stanford Financial. Sjoblom notified FINRA and the Federal Reserve and sent a letter to the SEC informing the Commission that Proskauer and Sjoblom had withdrawn from its representation of Stanford Financial, including SIBL, in all enforcement and other regulatory matters before the SEC. That same day, Alvarado tendered his resignation.

208.   On February 13, 2009 — the day *after* Proskauer and Sjoblom had withdrawn as Stanford Financial's legal counsel — SGC finally produced to the SEC the very same Private Equity Agreement that Sjoblom had previously advised Stanford Financial to withhold from its production.

209.   On February 25, 2009, Pendergest-Holt was *criminally* charged with lying to the SEC during her testimony on February 10, 2009.  In late March 2009, Pendergest-Holt filed a lawsuit against Proskauer and Sjoblom for legal malpractice and breach of fiduciary duty. According to her suit, Pendergest-Holt discovered – after her testimony to the SEC – that Sjoblom had solicited a multimillion-dollar retainer from Allen Stanford to represent Stanford

*personally* the night *before* Pendergest-Holt met with Sjoblom to prepare her testimony to the Commission.

## VI.    EXCEPTIONS TO ATTORNEY IMMUNITY

210.    The attorney immunity defense does not apply to the instant case because Sjoblom's and Proskauer's conduct was not undertaken in a litigation context in that (and as noted by the distinction made in Proskauer's own engagement letter) an SEC investigation does not constitute litigation.  Additionally, Sjoblom's and Proskauer's conduct was intended to – and did – further and perpetuate Stanford's fraudulent business schemes, and therefore said conduct was foreign to the duties of attorneys.  Furthermore, Defendants' conduct constitutes violations of several federal criminal statutes, which violations are similarly foreign to the duties of attorneys and fall outside the scope of representation because they are not within the bounds of the law.   Said criminal law violations include (i) obstruction of justice in violation of 18 U.S.C. § 1505, (ii) destruction of evidence in violation of 18 U.S.C. §1519, (iii) conspiracy to defraud the United States in violation of 18 U.S.C. §371, (iv) mail fraud in violation of 18 U.S.C. §1341, (v) wire fraud in violation of 18 U.S.C. §1343, (vi) bank fraud in violation of 18 U.S.C. §1344, and (vii) money laundering in violation of 18 U.S.C. §1956 and 18 U.S.C. §1957.  Therefore the crime exception to the attorney immunity defense applies.  Finally, the attorney immunity defense does not apply to Plaintiffs' claims under the Texas Securities Act ("TSA") because said statute is designed to serve the public policy of protecting investors from fraud, including fraud that is perpetuated with the assistance of attorneys like Defendants.

## VII.    STATUTE OF LIMITATIONS DEFENSES

### A.    Discovery Rule/Inquiry Notice/Class Action and Equitable Tolling

211.    The SEC filed an action against Allen Stanford and SIBL *et al.* on February 17,

2009, and on that same day the Receiver was appointed. Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered until more recently, the true nature of Defendants' participation in the Stanford fraud scheme and the injury suffered by them. Moreover, the Defendants' wrongful acts were inherently undiscoverable.  Plaintiffs also assert the doctrine of class action tolling under *American Pipe & Constr. Co. v. Utah*, 94 S. Ct. 756 (1974) or state tolling rules under which all claims for the class were tolled during the pendency of the *Troice* Action from August 27, 2009 (when the *Troice* Action was filed) until the *Troice* Action was finally dismissed, as well as the doctrine of equitable tolling.

## VIII.   BASES FOR PLAINTIFFS' CLAIMS

212.   For each of the following causes of action, Plaintiffs incorporate by reference and reassert the allegations above as if fully set forth below.

213.   All of the Plaintiffs and members of the putative class invested in the Stanford Financial Ponzi scheme by purchasing SIBL CDs or placing their money in other investment accounts with SIBL.   Over the years that Plaintiffs and the members of the putative class purchased and maintained investments in SIBL, Plaintiffs and the members of the putative class were repeatedly and uniformly told, either directly by their Stanford Financial FAs or via Stanford Financial promotional materials, that, inter alia:  (1) an investment in SIBL was safer than investing in U.S. banks because SIBL did not make loans but instead held its funds in a safe and highly liquid portfolio; (2) Stanford Financial was a U.S.-based business regulated by the U.S. Government; and (3) that an investment in SIBL was completely safe and secure because it was guaranteed and insured by Lloyd's, was thoroughly regulated, was audited by an "outside" audit firm and subjected to regular, "stringent" risk management examinations.  All of this was false.

A.      **Plaintiffs' Investments**

214.    During the time that Plaintiffs and the members of the putative class purchased and maintained investments in SIBL, Plaintiffs' Stanford Financial FAs and Stanford's uniform promotional materials repeatedly and uniformly omitted to inform Plaintiffs that, *inter alia*:  (1) Stanford Financial refused to allow investors, regulators, and even Stanford Financial FAs to gain access to information about SIBL's investment portfolio; (2) Stanford Financial, with Defendants' material assistance, had evaded and obstructed U.S. Government regulation of its activities for years to prevent regulators from obtaining access to SIBL's investment portfolio; (3) SIBL was operating illegally as an unregistered investment company soliciting and selling unregistered securities by, from and through Houston, Texas; (4) Plaintiffs' money invested in SIBL was not invested in safe, secure and liquid instruments, and in fact 80% of SIBL's assets were invested in illiquid, high risk investments that included $1.8 billion in unsecured loans to Allen Stanford, venture capital investments in private equity companies, airlines, and speculative real estate investments in the Caribbean; and (5) Stanford had consistently been under investigation by the U.S. Government since 1988.

215.    Based on the representations and omissions of material fact made to Plaintiffs and the members of the putative class repeatedly and uniformly over the years, both in person by Plaintiffs' Stanford Financial FAs and via Stanford Financial promotional materials, Plaintiffs decided to, and did, invest money in, and maintain investments in, the SIBL CDs.

216.    Plaintiff Sandra Dorrell followed her investment adviser and broker Doug Shaw to Stanford Financial after he left Wachovia Securities to join SGC in 2005.  In September 2005, Shaw convinced Dorrell to invest her savings in the SIBL CDs by assuring her that the CDs were a safer alternative than the stock market because SIBL was a bank and investments in SIBL were

liquid and insured by Lloyd's of London.  Dorrell invested in the SIBL CDs again in March and

May of 2006 based on Shaw's representations about the safety and security the bank CDs.

Shaw omitted to inform Dorrell (i) that Stanford refused to allow him, other Stanford FAs, and

regulators to have access to information about SIBL's portfolio, or (i) about all of Stanford's

violations of law, investigations by the U.S. Government and obstruction of regulators.  Based on

Stanford's and her FA's recommendations, representations and omissions, Dorrell ultimately

invested her life savings, some $1.3 million, in the SIBL CDs between September 2005 and

February 3, 2009, when Shaw convinced her to invest an additional $100,000 in a CD.   The last

purchase in February 2009 had to be made by personal check from her account instead of a wire

transfer.   No one at Stanford told Ms. Dorrell at that time that Pershing had refused to wire

transfer investment funds for Stanford.   Before making this final investment in SIBL CDs,

Dorrell asked Shaw about SIBL's condition given the financial crisis at the time, and Shaw told

her that Allen Stanford was extremely wealthy and proud and would never allow the bank to fail,

and that SIBL was as "solid as a rock" and "cash rich".

217.   Plaintiff Phillip A. Wilkinson invested his retirement savings with SGC and STC

in early June 2007.  At that time, Wilkinson met with an SGC investment adviser at the Houston

office of SGC, who advised him of the safety and security of an investment in SIBL CDs.

Following Stanford Financial Group's indoctrinated script, the SGC advisor made the same

uniform and standardized misrepresentations to Wilkinson, including that: (1) SIBL was "safer

than a U.S. Bank" because it had Lloyds of London bonded insurance; (2) SIBL was safe because

it did not make loans like a regular bank; but instead (3) invested in a portfolio of highly liquid

assets, such that the CDs could be redeemed on just a few days notice.  The FA did not disclose to

Wilkinson that (i) that Stanford refused to allow him, other Stanford FAs, and regulators to have

access to information about SIBL's portfolio, or (ii) that Stanford had been engaged in a long running campaign to evade and obstruct regulators in order to keep them from obtaining access to SIBL's investment portfolio.

218.    Based on those and Stanford Financial Group's other uniform and standardized sales misrepresentations and omissions of material facts, Wilkinson decided to open an IRA account with STC (Account No. STSGC40958), and following the advice of his SGC investment adviser, Wilkinson decided to invest all his retirement savings, some $500,000, into SIBL CDs. Wilkinson mailed his $500,000 check for the SIBL CDs directly to STC's bank, Hancock Bank, on June 13, 2007.

### B.    Class Allegations

219.    Plaintiffs Dorell and Wilkinson request this case be certified as a class action pursuant to FRCP 23.  Thousands of investors still had money invested in the SIBL CDs and other depository accounts at SIBL as of February 2009.  The numbers of affected investors are so numerous that joinder of all members is impracticable.  There are common questions of law and fact that are common to the class and these common questions predominate over individual issues.  The Named Plaintiffs' claims are typical of the class claims.  The Named Plaintiffs have no interest adverse to the interests of other members of the Class.  The Named Plaintiffs will fairly and adequately protect the class' interests.  The Named Plaintiffs have retained counsel experienced and competent in the prosecution of class action and complex international securities litigation.

220.    Pursuant to FRCP 23(a) and (b)(3), the Court should certify the following classes and subclasses:

i.     All persons or entities that deposited money in SIBL CDs or other investment accounts with SIBL within the limitations period, and still held said SIBL CDs or SIBL accounts as of February 17, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action; and

ii.    Such other classes or sub-classes as the Court may determine.

Excluded from the class are:

i.     Defendants, and their employees and agents; and

ii.    Any officer, director, employee, or promoter of Stanford Financial, including SIBL and SGC, as those entities have been defined herein.

221.   The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.  Indeed, this is a case of "fraud created the market" and fraud on the regulators because Stanford's fraud could not have existed or flourished were it not for the fraud Stanford committed on regulators around the world and the fraud Stanford committed by misleading investors and omitting to disclose material information to investors. The Class Plaintiffs and the Class relied on the integrity of the market in deciding to invest in the SIBL CD's.  Many of the investors who are class members have amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

## IX.     CAUSES OF ACTION

### (THE FOLLOWING CAUSES OF ACTION ARE PLEAD ON BEHALF OF ALL PLAINTIFFS

A.      **Aiding and Abetting Violations of the Texas Securities Act**

1.      **Sales of Unregistered Securities**

222.    Defendants are liable as "aiders" for sales of unregistered securities to Plaintiffs. In particular, by their actions described herein, Defendants provided substantial assistance to Stanford Financial, including Allen Stanford, SGC, STC, SFIS and SIBL, and made it possible for Stanford Financial to effectuate the sale of the SIBL CDs to Plaintiffs, and materially aided Stanford Financial to sell unregistered securities to Plaintiffs from and through Texas.  The CDs offered and sold by Stanford Financial and SIBL constitute "securities" under the relevant securities law jurisprudence, primarily the *Reves* test, precisely because the SIBL CDs were not insured by the FDIC, nor guaranteed by any similar government regulatory insurance regime. By assisting Stanford Financial Group's sales of these securities products, Defendants acted recklessly and knew or should have known, and were willfully blind to the fact that said sales were illegal.   But for Defendants' participation, Stanford Financial could not have sold unregistered securities to Plaintiffs from and through Texas.

223.    Defendants were generally aware that they were assisting in the sale of unregistered securities from and through Texas.  Defendants knew that Stanford Financial and SGC were based in Texas, that Stanford Financial controlled and made all the decisions for SIBL from Texas, and that the primary purpose behind SGC, STC and SFIS was to sell SIBL CDs. Defendants also knew that SIBL did not function as a regular bank making loans, but rather invested the CD proceeds in a private investment portfolio.  Furthermore, Defendants knew that the SIBL CDs had not been registered as securities with the SEC or Texas State Securities Board, and knew that Stanford Financial was involved in "general solicitation".   Based on their knowledge of Stanford Financial's operations, the size of the CD offerings made by SIBL, what

SIBL was allegedly doing with investors' money, Defendants also knew that the Reg. D exemption did not apply and that Stanford Financial was operating as an unregistered "fund" in violation of the Investment Company Act, selling unregistered investment company securities.

224.    In providing assistance that allowed a Houston-based enterprise to sell unregistered securities, Defendants were subjectively conscious of and willfully blind to a risk of illegality, and Defendants assisted Stanford Financial in the face of a perceived risk that its assistance would facilitate Stanford Financial's violations of the Texas Securities Act.  None of the SIBL CDs sold to Plaintiffs were ever registered with the Texas State Securities Board and therefore were sold to Plaintiffs as unregistered securities in violation of the Texas Securities Act.  In assisting Stanford Financial, including SGC, STC, SFIS and SIBL, to effectuate the sale of the unregistered securities from and through Texas, Defendants acted intentionally or with reckless disregard for the truth and the law.  As a result of Defendants' conduct in materially aiding SGC, STC, SFIS and SIBL to sell unregistered securities from and through Texas, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission and/or actual damages, measured as the difference between their investments as stated in their last account statements and the amounts that Plaintiffs may receive from the receivership distribution.

225.    Moreover, and despite Stanford Financial's scheme to evade compliance with the Texas Securities Act by claiming a Reg. D exemption, the global offering of CDs by Houston-based Stanford Financial Group to "accredited" U.S. investors was in fact an unregistered public offering made in violation of Article 581 of the Texas Securities Act.  It was an integrated offering under Texas securities laws, and, on information and belief, involved each of the following factors that made it a public offering and not a private offering exempt from

registration:

i. The integrated offering involved general solicitation. This general solicitation by Stanford Financial Group through SGC, STC, SFIS, and its U.S. affiliates, agents and brokers, as well as through foreign financial advisors, included general public advertisements, mass mailings, publicly distributed magazine articles, television and other communications, and media published in print in Houston, Texas and distributed broadly for general distribution in the United States and abroad to offerees and purchasers of the CDs.

ii. The integrated offering involved general solicitation through television advertisements, including advertisements broadcast in Texas, Louisiana and Florida, of Stanford Financial Group's products, including the SIBL CDs.

iii. The integrated offering involved seminars and meetings conducted in the United States (including Texas, Louisiana, and Florida), Mexico, and Venezuela and elsewhere in Latin America. The integrated offering was conducted through the use of sales seminars, "road shows," and meetings directed at potential offerees and purchasers.

iv. The integrated offering involved offers to tens of thousands of offerees and purchases by thousands of offerees involving sums of money, in the billions of dollars, far in excess of that disclosed to the SEC in SIBL's Form D filing with the SEC. The integrated offering involved offers to, and purchases by, at least thousands of Texas, Louisiana, and Florida residents or those otherwise subject to Texas, Louisiana, or Florida law, as well as offers and sales to Mexican and Venezuelan residents in the Texas and Florida offices of Stanford Financial Group and/or SFIS.

v. The aggregate size of the sales of SIBL CDs during this period was approximately $7.2 billion. The aggregate size of the sales in the United States during this period was in excess of $1.5 billion. The number of investors purchasing the SIBL CDs in the U.S. under the Reg. D filing was far in excess of 1,000, and over 1,000 IRA accounts at STC were invested in the SIBL CDs.

vi. The offering was made to investors with whom Stanford Financial Group, including SGC, had no pre-existing relationship, through brokers or affiliates of Stanford Financial Group who were paid substantial and excessive undisclosed commissions in connection with the SIBL CDs.

vii. The offering was made to persons who did not qualify as "accredited United States investors," and far more than 35 persons who did not qualify as "accredited United States investors" purchased the SIBL CDs; indeed the vast majority, at least $5 billion of the CDs, were sold to foreign citizens that did not qualify as "accredited United States investors."

2. *Sales of Securities by Unregistered Dealers*

226.     Defendants aided and abetted SIBL, STC, SFIS and Stanford Financial generally in the sale of securities to Plaintiffs from and through the State of Texas without being registered as a dealer, in violation of Sections 12(A), 33(A)(1), and 33(F)(2) of the Texas Securities Act. Specifically, and as alleged herein, Defendants knew or should have known that the global conglomeration of entities known collectively as "Stanford Financial" was acting as a type of investment company or "fund" without being registered as such under the Investment Company Act, and that the "fund" was illegally disguising itself as a bank (SIBL) and issuing unregistered "fund" shares, disguised as CDs, to the general public from, by and through Texas.  The Stanford Financial "fund" made these sales without registering with the Texas State Securities Board as a dealer under Section 12(A).

227.     Defendants intentionally and actively aided and abetted the Stanford Financial "fund" to sell securities from and through Texas, by means of the conduct described herein. With full knowledge or willful blindness to the fact that Stanford Financial was, directly or through its web of companies, including SIBL, acting as an unregistered investment company "fund" in Texas selling "fund" securities from and through Texas, and that Stanford Financial, including SIBL, was being operated and "run" from Texas, Defendants aided and abetted, materially and substantially assisted, and perpetuated Stanford Financial's, SGC's, SFIS' and SIBL's violations of the Texas Securities Act by continuing to provide the services described herein to help perpetuate sales of the worthless CDs and fund the Ponzi scheme.

228.     Defendants were generally aware of and willfully blind to the fact that it was assisting the sales by an unregistered investment company of unregistered "fund" securities from and through Texas.  In assisting the sale of unregistered "fund" securities through a Houston-

based enterprise, Defendants were subjectively conscious of a risk of illegality, and Defendants assisted Stanford in the face of a perceived risk that its assistance would facilitate Stanford Financial Group's violations of the Texas Securities Act.  In performing the acts described herein to aid and abet the sale of securities in Texas by an unregistered dealer, Defendants acted with the intent to perpetuate the sale of securities by an unregistered dealer, or acted with reckless disregard for the truth or the law.  As a result of Defendants' conduct in aiding and abetting the sale of securities in Texas by unregistered securities dealers, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission and/or actual damages, measured as the difference between their investments in SIBL as stated in their last account statements and the amounts that Plaintiffs may receive from the receivership distribution.

**3.      *Untruth or Omission***

229.    Defendants, acting with intent to deceive or with reckless disregard for the truth or the law, materially and substantially aided Stanford Financial, SGC, SFIS, and SIBL and their principals in the sale of uncovered securities (the SIBL CDs) through the use of untrue representations or materially misleading omissions, and also aided and abetted the fraudulent practices of registered investment advisers in violation of the Texas Securities Act.  In particular, and as found by this Court, Stanford Financial was a massive Ponzi scheme that was perpetuated by the continued sales of the SIBL CDs to unsuspecting investors like Plaintiffs.  Stanford Financial led Plaintiffs, verbally and through written marketing materials prepared and disseminated via Stanford Financial's Houston office, to believe that their money was being invested in safe, liquid investments, which was a material misstatement because the money was not invested in safe, liquid investments, but rather was pooled together with other investors' money and used to finance Stanford Financial's principals' lavish lifestyles and to invest in long-

term, illiquid and high-risk investments including venture capital investments, airlines, and real estate development projects in the Caribbean. Moreover, Stanford Financial omitted to inform Plaintiffs that it was selling them unregistered securities and that it was operating as an unregistered, unregulated, uninsured, illegal investment company "fund" in violation of the Investment Company Act and the Texas Securities Act, or that Stanford was engaged in a long running campaign to evade and obstruct government regulators so as to prevent regulators (or investors or even Stanford Financial FAs) from gaining access to SIBL's investment portfolio.

230.    Defendants were generally aware of and willfully blind to the fact that they were involved in improper activity and were assisting the sale of unregistered securities from and through Texas.  Indeed, Defendants knowingly advanced Stanford's master plan to skirt U.S. law by running an unregistered and unregulated investment company from the United States while tricking investors into believing that Stanford Financial was based in the U.S. and regulated by U.S. authorities.  With knowledge that Stanford Financial was misleading investors about the nature and risk of investments in related-party bank SIBL, particularly with regard to regulatory issues and lack of transparency into SIBL's portfolio, and with reckless disregard for the truth and the law, Defendant's provided substantial assistance to Stanford Financial as described herein, and thereby materially aided the Stanford Financial entities' sales of securities through the use of untruths and materially misleading omissions.  Defendants were subjectively aware of, and absolutely indifferent to, the risk posed by their conduct.  Defendants were subjectively conscious of a risk of illegality, and Defendants assisted Stanford in the face of a perceived risk that their assistance would facilitate Stanford's violations of the Texas Securities Act.  In short, Defendant's actions as described herein allowed Stanford Financial, including SGC, SFIS, and SIBL, to continue to sell securities to Plaintiffs from and through Texas using untruths and

materially misleading omissions.

231.    As a result of Defendant's conduct in aiding and abetting the sale of securities from, by and through Texas using untruths and materially misleading omissions, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission and/or actual damages, measured as the difference between their investments in SIBL as stated in their last account statements and the amounts that Plaintiffs may receive from the receivership distribution.

### B.      Participation in/Aiding and Abetting Breach of Fiduciary Duty

232.    On November 30, 2011, this Court issued an Order (Doc. 1483) in the SEC Action holding that the SEC had adequately alleged that Allen Stanford acted as an investment adviser to all of the Stanford CD investors.  Plaintiffs hereby allege that Allen Stanford was an investment adviser. As an investment adviser, Allen Stanford owed fiduciary duties to Plaintiffs and breached those duties.  Defendants participated in and aided and abetted Allen Stanford's breaches of fiduciary duties owed to Plaintiffs.

233.    As investment advisers, SGC, SFIS and all of the Stanford Financial FAs who, for compensation, advised Plaintiffs to buy the SIBL CDs, owed a fiduciary duty to Plaintiffs as a matter of law.    In particular, Stanford Financial FAs serving as investment advisers had fiduciary duties of "utmost good faith and full and fair disclosure of all material facts".   The Stanford Financial FAs employed by SGC, SFIS and other Stanford Financial entities breached their respective fiduciary duties to Plaintiffs and the other Stanford investors by advising them to invest their money in the SIBL CDs without disclosing to the investors that the FAs had no knowledge of SIBL's investment portfolio because Stanford Financial prevented them from obtaining access to such information.  As a result, such investments in SIBL CDs were entirely

imprudent and unsuitable for any investor and because SGC, SFIS and the FAs had no idea how SIBL was using their money and the FAs were financially incentivized to recommend the related-party SIBL CDs above other investment products.  SGC, SFIS and the Stanford Financial FAs did not have the basic financial information regarding the SIBL CD investments necessary to make such investment recommendations to Plaintiffs, but instead made the recommendations to purchase the SIBL CDs based on the huge, above-market commissions that SGC, SFIS and the FAs were paid to promote the CDs.

234.    Defendants knew that Allen Stanford, SGC, SFIS and the Stanford FAs generally owed fiduciary duties to Plaintiffs, and Defendants were aware that Allen Stanford, SGC, SFIS and the Stanford FAs were breaching these fiduciary duties.  Defendants also knew that that they were aiding, abetting, and otherwise participating in Allen Stanford's, SGC's, SFIS's and the Stanford FA's breaches of those duties by the conduct alleged herein.  The breaches of fiduciary duties by Allen Stanford, SGC, SFIS and the Stanford FAs, and Defendants' awareness of their participation in such breaches, were a proximate cause of actual damages to Plaintiffs.  Defendants knew or should have known that its aiding, abetting, and participation in the breaches of fiduciary duties set out above likely would result in extraordinary harm to Plaintiffs.  Accordingly, Plaintiffs are entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this court.

## C.    Aiding and abetting/Participating in a Fraudulent Scheme

235.    By their conduct described herein, Defendants aided, abetted, and participated with Stanford Financial, including SGC and SFIS, in a fraudulent scheme, making Defendants directly liable for fraud.  In particular, Defendants assisted and enabled Stanford Financial, including SGC and SFIS, in their sales of SIBL CDs to Plaintiffs through their services to

Stanford. Such actions by Defendants in combination with Stanford Financial are a proximate cause of actual damages to Plaintiffs measured as the difference between their investments in Stanford Financial as stated in their last account statements and the amounts that Plaintiffs may receive from the Receivership distribution.

### D. Civil Conspiracy

236. Defendants conspired with Allen Stanford, his co-conspirators, and the Stanford Financial companies to commit the wrongful conduct described herein, including breaches of fiduciary duties and fraudulent. Defendants are responsible for all wrongdoing done by each of the other members of the conspiracy, including Allen Stanford, Jim Davis, Mauricio Alvarado, Laura Pendergest-Holt, Rebecca Hamric, Jane Bates, Lena Stinson, Bernie Young, SIBL's president Juan Rodriguez-Tolentino, Leroy King, and others, in furtherance of the unlawful conspiracy and enterprise. In particular, Defendants are responsible for Allen Stanford's and his co-conspirators' fraud and theft of billions of dollars in assets.

237. There was a meeting of the minds between Stanford, Davis, Alvarado, King, and others as to the need to conceal SIBL's investment portfolio and Stanford Financial's true nature and activities ,and to evade regulatory scrutiny. This meeting of the minds grew to include other participants, including Pendergest-Holt, members of the Antiguan Government, and eventually, Defendants. Defendant Sjoblom joined the conspiracy and had a meeting of the minds with Allen Stanford and his co-conspirators in August 2005, and this meeting of the minds continued while Sjoblom was employed by Proskauer. In this meeting of the minds, Defendants agreed to assist Stanford Financial in concealing the fraudulent nature of its activities by evading regulatory scrutiny and preventing access to SIBLs portfolio information from 2006 through February 2009, which concealment was crucial and central to the perpetuation of the Stanford Ponzi scheme.

93

Defendants therefore knowingly combined together with Allen Stanford and the co-conspirators in assisting Stanford Financial to frustrate the investigatory efforts of the SEC and other U.S. regulatory bodies and agencies so as to enable the Stanford Ponzi scheme.

238.    As described herein, Defendants took various overt acts designed to assist Stanford Financial and SIBL to accomplish the goal of shielding Stanford Financial and SIBL from regulatory scrutiny and therefore further the Stanford Ponzi scheme. These overt acts in furtherance of the conspiracy included lying to the SEC about Stanford Financial, SIBL, and SGC, and encouraging others to lie, hide documents, and otherwise mislead and deceive the SEC in an ongoing SEC investigation. By doing so, Defendants acted pursuant to their meeting of the minds with Stanford, Davis, Alvarado and other co-conspirators in pursuit of the common purpose of the conspiracy: to conceal the fraudulent nature of Stanford Financial's and SIBL's activities and shield Stanford Financial and SIBL from regulatory scrutiny by thwarting an active investigation by the SEC so as to allow Stanford Financial and SIBL to continue perpetuating the Ponzi scheme. Defendants' conspiracy with these co-conspirators to commit fraud, breach fiduciary duties and participate in a fraudulent scheme, is a proximate cause of actual damages to Plaintiffs and the members of the putative class.

239.    Defendants' actions in furthering the conspiracy to conceal, hinder and obstruct regulatory investigations were taken during the conspiracy's operation. Indeed, Defendants' actions were taken to protect the Stanford Ponzi scheme and to avoid regulatory intervention so that the Stanford Ponzi scheme could continue and Stanford Financial could continue paying Defendants' bills. Therefore, Defendants' actions were part of a continuing activity that was illegal in nature and essential to furthering the survival of an ongoing Ponzi scheme conspiracy. But for the overt acts taken by members of the conspiracy to further the conspiracy's objectives

as described herein, Allen Stanford and his co-conspirators would not have been able to execute the Ponzi scheme, and billions of dollars in damages to Plaintiffs and the members of the putative class would have been avoided.

## X.   RESPONDEAT SUPERIOR

240.   Defendant Proskauer is liable for the tortious acts of its employee, Defendant Sjoblom. From August or September 2006 through late 2009, Sjoblom was an employee of Proskauer.  Sjoblom was acting within the course and scope of his employment with Proskauer, and in furtherance of said law firm's business, when he engaged in the wrongful conduct described herein.

## XI.   ACTUAL DAMAGES

241.   Plaintiffs and the Class have suffered the loss of at least $5 billion that was proximately caused by the wrongful conduct of Defendants as described herein.  Defendants are jointly and severally liable for the injury caused by Stanford under Texas common law of joint and several liability as well as article 581-33(F) of the Texas Securities Act.

## XII.   PUTATIVE DAMAGES

242.   The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of §41.003, Tex. Civ. Prac. & Rem. Code. Plaintiffs are entitled to recover punitive damages in an amount necessary to punish the Defendant and to deter similar conduct of others in the future.

243.   All conditions precedent to filing this Complaint have been met.

## XIII.   JURY DEMAND

244.   Plaintiffs demand a trial by jury.

## XIV.   PRAYER

WHEREFORE, Plaintiffs pray the Defendants be summoned to answer this Complaint, that this action be certified as a class action, and that the case be tried before a jury and that upon final judgment the classes and sub-classes as set forth in each cause of action hereof recover their damages as alleged herein, including their actual damages, punitive damages, and their costs and expenses of suit, including reasonable attorneys' fees.  Plaintiffs pray for such other relief to which they may be justly entitled.

Dated: April 28 , 2016

Respectfully submitted,

**CASTILLO SNYDER, P.C.**

By: */s/ Edward C. Snyder*
      Edward C. Snyder
      esnyder@casnlaw.com
      Jesse R. Castillo
      jcastillo@casnlaw.com
      700 N. St. Mary's Street, Suite 405
      San Antonio, Texas  78205
      (210) 630-4200
      (210) 630-4210 (Facsimile)

**NELIGAN FOLEY, LLP**

By: */s/ Douglas J. Buncher*
      Douglas J. Buncher
      dbuncher@neliganlaw.com
      Republic Center
      325 N. St. Paul, Suite 3600
      Dallas, Texas  75201
      (214) 840-5320
      (214) 840-5301 (Facsimile)

**STRASBURGER & PRICE, LLP**

By: */s/ David N. Kitner*
      David N. Kitner
      david.kitner@strasburger.com
      901 Main Street, Suite 4400
      Dallas, Texas  75202
      (214) 651-4300
      (214) 651-4330 (Facsimile)

**STRASBURGER & PRICE, LLP**

By: */s/ Judith R. Blakeway*
      Judith R. Blakeway
      judith.blakeway@strasburger.com
      Merritt Clements
      merritt.clements@strasburger.com
      2301 Broadway
      San Antonio, Texas  78215
      Telephone: (210) 250-6000
      Facsimile: (210) 250-6100

**COUNSEL FOR THE PLAINTIFFS**